DURFEE, APPELLANT, *v.* HARPER ET AL., RESPONDENTS.

---

THOMPSON INVESTMENT CO., RESPONDENT, *v.* DURFEE, APPELLANT.

[No. 1,352.]

[Submitted February 27, 1899.   Decided March 28, 1899.]

*Constitutional Amendments — Enactment — Assignments for Creditors—Powers of Assignee—Pledges— Waiver of Lien— Stock—Mandamus—Appeal.*

1.  Constitution, Article VIII, Section 5, as amended in 1897 (Session Laws, 5th Session, page 57), by providing for calling in a district judge when a supreme court judge is disqualified, is void for failure to enter on the journals of both branches of the legislature a full copy of the proposed amendment, before its submission to the people, as required by Article 19, Section 9.
2.  The fact that the attorney for the assignee for the benefit of creditors was a bidder in behalf of a third person at a sale of the debtor's property by the assignee, where known to both the persons buying and the persons selling, and no injury resulted therefrom, is not, *per se*, sufficient to warrant the cancellation of the purchase by the attorney for the third person.
3.  An assignee for the benefit of creditors, to whom is assigned the title to stock pledged by the assignor,—notice of the assignment being given to the pledgee,—stands in the shoes of his assignor, in so far as his rights as a pledgor are concerned.

4. An assignee for the benefit of creditors, in making a sale announced to be for cash only, may set aside a sale to one who could pay but a small part of the amount bid, and may resell the property on a smaller cash bid.

5. An assignee for the benefit of creditors may redeem property pledged by the assignor.

6. A pledgee and the pledgor's assignee for benefit of creditors may agree that the assignee shall sell the pledged property at private sale, and for cash only.

7. A surrender of the pledged property to the assignee of a pledgor for the purpose of a sale does not waive the pledgee's lien, where the rights of creditors have not been prejudiced.

8. As a general principle, *mandamus* will not lie when other adequate and specific remedies may be had.

9. Where the ownership of shares of stock is litigated in an injunction suit, as the court can order an officer of the corporation, who is a party to the suit, to issue the stock to the successful party, though the corporation is not a party, it being entirely disinterested, the remedy is complete, so that *mandamus* will not lie to compel such issuance.

10. An objection based on an entirely different theory from the one used by both parties in the trial court cannot be urged on appeal.

*Appeal from District Court, Granite County; Theodore Brantly, Judge.*

SEPARATE ACTIONS by F. M. Durfee against Joseph H. Harper, assignee of F. M. Durfee and F. W. Sherman, and others, and by the Thompson Investment Company against F. M. Durfee. From a decree against Durfee in both cases, he appeals. Modified.

Statement of the case by the Justice delivering the opinion.

The action under the first above mentioned title was brought by Durfee, plaintiff and appellant, against Harper, assignee of Durfee & Sherman, and the other defendants, to set aside a sale of two certificates of the capital stock of the Sunrise Mining & Milling Company, and to prevent the transfer of said certificates on the books of the company. The second cause was an action by the Thompson Investment Company for a writ of *mandamus*. It arose out of the transactions involved in the first suit, and was brought to compel F. M. Durfee, the defendant, as the president of the Sunrise Mining & Milling Company, to execute and deliver to the Thompson Investment Company, plaintiff, the shares of stock which it had bought at the sale heretofore referred to. By order of the District Court, the causes were tried together, and

one decree entered. The trial court refused the injunction prayed for by Durfee, enjoining the defendants from transferring the property and stock of the Sunrise Mining & Milling Company, but granted the *mandamus* applied for in the second action.

It appears that the Merchants' & Miners' National Bank was a banking corporation at Philipsburg, Mont.; that the Thompson Investment Company is a corporation doing business at Butte, Mont.; that in 1896 the plaintiff Durfee and one F. W. Sherman owned in common 127,029⅔ shares of the stock of the Sunrise Mining & Milling Company, and about ——, 1896; pledged the said shares of stock to the Merchants' & Miners' National Bank (which we shall hereafter call the ''Bank'') for the purpose of securing the payment of an indebtedness of Durfee & Sherman to said bank amounting originally to about $40,000, and $15,000 at the time of this suit. The authority of sale given to the bank was only such as the law generally confers upon pledgees. (Civil Code, Sec. 3890 *et seq.*) It further appears that on May 11, 1896, Durfee & Sherman made an assignment of all their joint and several property to the defendant James H. Harper, for the benefit of their creditors. Harper qualified and has acted as assignee ever since. In this assignment made to Harper were included 138,371 shares of the Sunrise Mining & Milling Company, owned jointly by Durfee & Sherman; the certificates representing this latter number of shares were duly delivered to Harper as assignee, and the stock was issued to him as assignee upon the books of the Sunrise Company. D. M. Durfee was the secretary of the Sunrise Mining & Milling Company and at the time of the transactions hereinafter mentioned E. B. Howell was counsel for the assignee, Harper, and for the defendant the Thompson Investment Company. The complaint in the injunction suit avers that the defendant Harper and the bank, through its agent, one McDonald, and the defendant Howell conspired together for the purpose of obtaining the 265,400⅔ shares of the stock of the Sunrise Company, which included the 127,029⅔ shares that had been

assigned as collateral to the bank, and, to defraud and cheat this plaintiff, F. M. Durfee, out of his rights in said property, agreed between themselves that they would sell the whole number of the shares of stock in one block; and that the bank never complied with the law with reference to the sale of stock so deposited as collateral with it, and never gave plaintiff any notice that the stock would be sold to satisfy the debt due it. It is then averred that Harper, pretending to act for this plaintiff, but in reality conspiring to defraud plaintiff, agreed with the bank to sell the stock and deliver the same to Harper, to be sold along with the 138,371 shares that had been assigned to Harper; that the bank entered into the conspiracy with Harper, and that Howell also conspired and directed Harper as to the method and manner of selling, and bid upon the purchase of the same at the sale. It is alleged that the property was advertised for sale on October 27, 1898, but that the sale was postponed to November 29th thereafter, and that on November 29, 1898, the whole number of shares in the Sunrise Company was offered for sale, and McDonald, the agent of the bank, bid for it the sum of $10,000. It is alleged that, over and above the debt due by Durfee & Sherman to the bank, there was a debt due to Hoge, Brownlee & Co. and the expenses of the assignment, amounting in all to not more than $2,500, and that the stock was sold first to satisfy the indebtedness of Hoge, Brownlee & Co., and the costs of the assignment, but that this preferred debt applied only to the 138,371 shares of the stock assigned to Harper, and that the balance of the indebtedness against the said 138,371 shares, and the total indebtedness against the 127,029⅔ shares was the debt due to the bank as aforesaid; that notwithstanding the bid of McDonald of $10,000, and his offer to pay to the assignee all the money required to discharge the debt due to Hoge, Brownlee & Co., and to hold and retain the said shares of stock for and on behalf of the bank, the said Harper, as assignee, disregarded his duty, and demanded that the said McDonald should deposit and pay him, as assignee, $10,000 in cash; that McDonald refused to pay

the same, and thereupon Harper, on the night of November 28th, sold the entire block of stock to E. B. Howell, his own attorney and agent, for $9,500. It is averred that in thus consenting, and directing the bank to sell the stock for the plaintiff, Harper committed a fraud, and that in demanding of the bank $10,000 in cash, when as a matter of fact only $2,500 or less was required to discharge all of the debt over and above the debt of said bank, Harper committed a fraud, and that, in consenting that the whole of the stock be offered in one block, he acted to the disadvantage of the plaintiff, because, if the stock had been sold in small blocks, it would have realized more. It is also averred that Harper is one of the creditors of the Sunrise Company, and that Howell at the time he bid for the stock was acting for the Thompson Investment Company; that the Thompson Investment Company in July, 1898, bought the whole property of the Sunrise Mining & Milling Company for the creditors of said company, including the defendant Harper; that the stock so sold to Howell was for the Thompson Investment Company, acting as the agent of the creditors aforesaid; that Howell deposited the stock, after the sale to him, with D. M. Durfee, the secretary of the mining company, and demanded the transfer of the same to him, or his assignee, on the books of the company; and that, unless Durfee is enjoined from making the transfer, he will transfer the stock to Howell, to the injury of plaintiff.

The defendants set up that the 127,029⅔ shares which had been assigned to the bank were also assigned by Durfee & Sherman to Harper, subject only to the right of defendant bank in said stock as collateral security for the debt due by Durfee & Sherman to the bank. The allegations of a conspiracy are denied. They admit the bid of $10,000 by the bank, and plead that the aggregate number of shares, to wit, 265,400⅔, constituted a majority of the capital stock of the Sunrise Company, and that the assignee, Harper, and McDonald, as the agent of the bank, believing that the stock would sell to better advantage if sold in a lump, agreed that

it should be sold together, and that the bank thereupon waived the right to sell the 127,029⅔ shares pledged to it, and delivered the same to Harper, to be sold with the 138,-371 shares; that at the sale on November 29, 1898, it was announced that the terms would be for cash; that Howell, for the Thompson Investment Company, bid $9,500, and that McDonald thereupon bid $10,000 for the bank, but was unable to pay the said sum, or any portion thereof; and that the costs of the assignment, together with the claims against the estate of Durfee & Sherman, which had priority over the debt due the bank, amounted to more than $2,500. It is also alleged that it was necessary for Harper to realize a sufficient sum to pay the costs and expenses and the prior claims, and that the said bank and its agent, being unable to pay the necessary amount of cash, requested Harper to resell the stock; that the assignment authorized the assignee to sell the property assigned, or any portion thereof, at public or private sale, as he might deem best for the interests of the creditors of Durfee & Sherman, and that thereupon Harper sold at private sale the whole number of shares of stock to defendant Howell, as the agent of the Thompson Investment Company, for $9,500 in cash, it being the next highest bid for said stock; and that said amount is the reasonable value of the stock, and the highest amount which Harper was able to obtain for the same at the time of its sale. Defendants admit that by reason of the failure of the bank to purchase the stock and to pay the cash, and by reason of the subsequent sale of the stock for $500 less than the amount bid by the bank, Durfee & Sherman, and Harper, as their assignee, became entitled to the credit of $500 upon the indebtedness of Durfee & Sherman held by the bank; but it is averred that the plaintiff, before the commencement of this suit, made no demand for such credit. Defendants also set up that the plaintiff, who is the president of the Sunrise Mining & Milling Company, refuses to sign the certificates of stock necessary to effect a transfer, and that the Thompson Investment Company will be prevented from participating in the election of trustees, unless

relief is granted; that the plaintiff and the Sunrise Company are insolvent, and, unless injunction is issued, great injury will be done.

Thereafter, plaintiff, by leave of the court, amended his complaint by alleging that the 265,400⅔ shares of the stock in the Sunrise Company were worth largely in excess of what it was sold for, to wit, the sum of $15,000.

In the proceeding for *mandamus*, the affidavit of William B. Thompson, after setting forth the more formal matters substantially as embraced in the pleadings in the action heretofore referred to, prayed for an alternative writ of mandate, commanding the defendant therein, F. M. Durfee, to sign, as president, the certificate of stock to be issued by the Sunrise Company to the Thompson Investment Company for the block of stock purchased by the said Thompson Investment Company.

F. M. Durfee filed an answer to plaintiff's affidavit for a writ of mandate, denying the allegations therein contained, and reiterating the charges of conspiracy and fraud as hereintofore recited, and affirmatively praying for an order prohibiting the transfer of the mining stock to Howell, and prohibiting Harper from proceeding any further in the matter of the assignment, and asking the removal of Harper, and that the sale of the stock to Howell be declared void, and for further relief. F. M. Durfee appeals.

*W. E. Moore, Josiah Shull, Sanders & Sanders* and *Toole, Bach & Toole,* for Appellant.

*Durfee & Brown, E. W. Harney* and *E. B. Howell,* for Respondents.

HUNT, J.—At the outset of this case we find ourselves confronted with a constitutional point of much importance, necessitating a decision of the question whether the amendment to the Constitution of the State relative to the justices of the Supreme Court, proposed by the act of the Fifth Legislative Assembly, approved March 3, 1897, and voted upon at the gen-

eral election held in November, 1898, became, and now is, a portion of the Constitution itself.    The inquiry arises in this way: The  Fifth Legislative Assembly provided for  the submission to the qualified electors of the state, at the general election of 1898, of an amendment to Section 5 of Article VIII of the State Constitution, relating to the Supreme Court.    The substance of  the proposed amendment was that, in case any justice of the Supreme Court should be disqualified to sit in a cause brought before said court, the remaining justices not disqualified should have the power to invite a district judge to sit with them on the hearing of such cause, and the decision and opinion of the district judge sitting in such cause should have the same force and effect as if regularly participated in by a justice of the Supreme Court.    (Session Laws, 5th Sess., page 57.)    This proposed amendment was duly advertised, and was voted for by a majority of the qualified voters voting thereon at the general election of 1898, and was subsequently declared adopted.

When the case now before us was assigned for hearing, it appeared that Chief Justice Brantly was disqualified.    Accordingly, assuming that the aforesaid constitutional amendment was in force, Justice Pigott and myself, by invitation, called upon the Honorable Frank Henry, Judge of the District Court of the Sixth Judicial District, to sit with us in the cause.    But, before the case was regularly called, Hon. Wilbur F. Sanders, as *amicus curiæ*, addressed our attention to the fact that it was probable Judge Henry could not properly sit for the reason that the amendment to the Constitution under the provisions of which we had acted in calling upon him had never been legally proposed for adoption by the Fifth Legislative Assembly, inasmuch as it never had been entered in full on the respective journals of the two houses of the assembly, as required by Section 9 of Article XIX of the Constitution.    The Attorney General appeared, and stated that it was a record fact that there never had been an entry in full of the proposed amendment upon the legislative journals. Thereupon, of its own motion, the Court, without delay, in-

vited and heard arguments upon the point, and is now pleased to acknowledge the assistance of both Mr. Sanders and Attorney General Nolan in the premises. We have also availed ourselves of many decisions found by original research, and are thoroughly convinced, on reason and case, that the consequence of the disobedience of the mandate of the Constitution, requiring that proposed amendments to the Constitution "shall be entered in full" on the respective journals of the houses of the legislative assembly, is not such as may sometimes follow mere omission by the Legislature in respect to a statute, but is the inevitable nullification of the proposed amendment, now that its history is judicially examined.

An amendment to the Constitution, like the Constitution, obtains life by the direct power of the people. No other authority can be put above them, or act for them, in respect to effecting changes in their organic law. A legislative assembly may amend or enact statutes, and, within their province as representatives of the people, legislators are supreme in the exercise of a constitutional lawmaking power (*State* v. *Long*, 21 Mont. 26, 52 Pac. 644); but, in respect to the Constitution, they are by that instrument's terms *proposers* of amendments,—machinists operating intermediate machinery, through means of which, as the people's agents, they may *propose* an amendment to their Constitution, but which the people have provided must eventually come directly before them in its molded form, to be adopted or rejected by their votes, and by them alone.

This distinction between the authority of the Legislature in relation to enacting laws and proposing changes in the Constitution must not be overlooked, for it emphasizes in an unmistakable way the measure of power which can be exercised effectively by delegated representatives, and that which can alone be exercised by the people in their own sovereignty. The legislative assembly can no more subtract from the various steps specified in the organic act to be taken by itself antecedent to submitting amendments to the Constitution, than can it amend the Constitution without such submission to the

people.   It may attempt to propose amendments to the full
number allowed, but it is powerless to make its proposals
operative to accomplish the fact of amendment, without first
exercising and pursuing its authority in the single mode of
proceeding which the people have directly prescribed in all
instances where the Legislature passes a proposed amendment
at all.   No argument is needed to uphold the rule that the
provisions of our Constitution are mandatory and prohibitory,
unless by express words declared to be otherwise.   The Con-
stitution so declares, and the reasoning of Justice De Witt in
*State* v. *Tooker*, 15 Mont. 8, 37 Pac. 840, is conclusive upon
that proposition.   That decision, too, is to a great extent con-
trolling of the point under examination, as it was there de-
cided that, where the mode by which an amendment to be
made to the Constitution is clearly pointed out by the Consti-
tution itself, such mode is a substantial and essential part of
the instrument itself, to be regarded by the Legislature as ex-
clusive, and as not permitting any other mode or form to be
observed.

Thus the proposition comes back to the statement that from
the people, as a source, alone flows the delegated power of the
Legislature to even *propose* amendments to those "unvarying
rules" by which "alike the government and the governed"
are controlled, and where those rules adopted by the people
are part of their Constitution, and lay down how this power
may be exercised by the Legislature, there is no discretion in
that body to ignore the commands of the fundamental author-
ity, or override its limitations in great or small matters; and
this principle holds good, not only for the legislative, but, so
far as applicable, for the judicial and executive, departments
of the government as well.

We conclude, therefore, that the failure to enter on the
legislative journals the proposed amendment under which
Judge Henry was invited to sit was a disobedience of the Con-
stitution itself, and that our duty in expounding the supreme
law compels us to decide that the proposed amendment never
was proposed as required, and therefore never ought to have

been submitted. It was a nullity before it reached the people, and was not animated by them, because their own solemn commands empowering its proposal, and specifying the mode thereof, had been entirely ignored by the proponent.

The following authorities are cited to sustain our opinion: *In re Convention*, 14 R. I. 649; *State* v. *McBride*, 4 Mo. 303; *State ex rel. Morris* v. *Secretary of State*, 43 La. Ann. 590, 9 South. 776; *Collier* v. *Frierson*, 24 Ala. 100; Answer of the Justices, 6 Cush. 573; *Oakland Paving Co.* v. *Hilton*, 69 Cal. 479, 11 Pac. 3; *Koehler* v. *Hill*, 60 Iowa, 543, 14 N. W. 738, and 15 N. W. 609; *Russie* v. *Brazzell*, 128 Mo. 93, 30 S. W. 526; *Miller* v. *Johnson*, 92 Ky. 589, 18 S. W. 522; Cooley, Const. Lim. p. 44; Jameson, Const. Con. Sec. 564 *et seq.*; *State* v. *Tufly*, 19 Nev. 391, 12 Pac. 835.

2. Upon the merits it is strenuously contended that the sale of the 127,029⅜ shares of the stock to the Thompson Investment Company was void because of a conspiracy; because it was a sale of a pledge before demand made for the performance of the act for which the pledge was a security; because of lack of actual notice of the time and place of the sale, and because the sale was not made by public auction, or upon any notice to the public.

Stating the transaction at the sale very briefly, it was this: The assignee on October 14, 1898, had advertised that 127,-029 shares of the capital stock of the Sunrise Company, held as collateral security by the Merchants & Miners' Bank, would be sold at public sale, subject to the rights of said bank in said stock, and also that 138,371 shares of the capital stock of said mining company would be sold. On November 29th thereafter, the assignee, with Mr. Howell, his attorney, conducted a sale. Just before the sale it was announced that cash would be required from the successful bidder. The power of sale given to the assignee under the assignment was read by Mr. Howell, and it was announced that, if cash was not paid, the assignee reserved the privilege of rescinding any sale which might be made, and of selling the stock or property to any other person whom he might choose, according to the terms

of the assignment, authorizing a public or private sale, the entire 265,400⅔ shares of the stock in the Sunrise Company were put up in one lot. It was suggested that a bidder would like to bid for 138,000 shares separately, but Mr. Howell announced that the entire block constituted a majority of all the stock of the company, and would be sold in one. Mr. Howell started the bidding at $7,500, in behalf of the Thompson Investment Company; but Mr. McDonald, the agent for the bank, finally bid $10,000, and the stock was sold to him. Mr. Durfee, the plainciff herein, demurred to the sale of the stock which had been pledged to the bank, and desired a further postponement, in order, apparently, that certain persons might have an opportunity to buy the stock. There had been some previous negotiations with a Mr. Smith, from Chicago, concerning the purchase of this stock, but they never amounted to anything definite. The assignee refused to further postpone the sale. The bid made by McDonald, the agent of the bank, was evidently in the interest of Mr. Smith and others, with whom, in behalf of the bank, its agent, McDonald, expected to make some arrangement by which the bank would make the amount of its lien. Mr. McDonald after the sale said that Smith told him he would have to have 48 hours in which to raise $2,500 in cash, and even then he wanted three months' time to pay the balance of the $10,000 bid by McDonald. The assignee concluded not to accept the proposition of the bank, and upon the same evening notified Mr. Howell, who had made a bid of $9,500 in behalf of the Thompson Investment Company, that he would sell the stock to him for that sum. It was then agreed that the stock should be turned over to the Thompson Investment Company for $9,500 net. Thereupon Mr. Harper, the assignee, with Mr. McDonald's consent, handed over the certificates of stock to Mr. Howell, for the Thompson Investment Company; and the purchase price, $9,500, was paid to the assignee. Before the public sale, Mr. Howell consulted with the assignee about the propriety of his making a bid for the Thompson Investment Company, and the assignee said that he could not see anything

wrong in it, and hoped that he would make such a bid. The assignee's testimony was that after the sale to McDonald, the agent of the bank, and after the assignee found that no money would be forthcoming under the bid that had been made at the public sale, he rescinded the sale, and accepted the bid of the Thompson Investment Company for $9,500, which was the next best bid offered. He further said that he had been anxious for two years to realize upon the property, and that he never had at any time been offered a larger amount in cash for the stock than the $9,500 for which it was sold, and that he considered the amount realized a fair and reasonable sum. He further stated that there was no arrangement between himself and the officers or agents of the Thompson Investment Company by which the judgment creditors should realize on the property or stock, and that Mr. Howell informed him that he intended to bid for the stock. He also said that he felt that the stock, unless sold, would have soon been worthless, and that he was anxious to make the sale for these reasons, and because the time for redemption of the property would have expired within a few months thereafter. It is evident that the parties behind McDonald wanted to buy the property by paying only $2,500 in money. The agent of the bank, McDonald, testified that after consultation with them he rejected their propositions for time, in justice to the stockholders of the bank, and that he thought it to the best interests of the bank for him to allow Harper, as assignee, to sell the stock to the Thompson Investment Company, and that it was his wish that the sale should be made that day, because there was money in sight, and he did not know whether there would be at any other time.

As we regard the case, the sale to the Thompson Company was fairly and honestly conducted. Mr. Howell's attitude is satisfactorily explained. We grant that he was in a delicate position,—one such as a lawyer always should avoid. But it having been honestly and openly assumed, and known by the parties buying and selling, and it being apparent that no injury has been done to any person's rights on account of it,

and that the relationships themselves do not necessarily or actually conflict, it will not be regarded as wrong *per se*, ·or sufficient to lead to a cancellation of the several acts performed by the attorney. The assignee also evidently acted fairly, and within the limits of the authority given him by the assignment. Nor is there any evidence of bad faith on the part of the bank,—much less of any concerted agreement between its agent and Howell and the Thompson Investment Company to do an unlawful act, or to dispose of the stock at any price except the best that could be had. It follows that the finding of the lower court to the effect that there was no conspiracy, and no dishonesty or unfairness in the sale of the stock to the Thompson Company, must be affirmed.

The legal status of the parties was this: Durfee & Sherman owned the stock pledged to the bank prior to their assignment;—that is, the general property in the security remained in them. The bank had a lien only, dependent upon possession. (Civil Code, Sec. 3890 *et seq.*) Had no assignment to Harper been made, before the stock pledged could have been sold, demand of payment, and actual notice to Durfee & Sherman of the time and place at which the stock pledged would be sold by the bank, would have been essential, unless waived. But, it being a correct proposition that the general property in the stock remained in Durfee & Sherman, they had a perfect right to assign or transfer their interest in it, by any proper instrument, and upon valid consideration, subject always to the lien of the Merchants' & Miners' Bank. And, in so transferring it, the actual custody and possession being in the bank, under lawful lien, a constructive or symbolical delivery to Harper, assignee, was sufficient, where the bank knew of the assignment, as was the case here. Notice brought to the bank put it in the position of pledgee of the assignee, who stood in the shoes of the assignors, Durfee & Sherman. Story (Bailm. Sec. 350) says:

"Subject to the rights of the pledgee, the owner has a right to sell or assign his property in the pawn; and in such a case the vendee will be substituted for the pledgor, and the pledgee

will be bound to allow him to redeem, and to account with him for the pledge and its proceeds. If he refuses, an action at law will lie for damages, as well as a bill in equity to compel a redemption and account.'' To like effect is Jones on Pledges, Sec. 364.

The correct rule is stated by Edwards (Bailm. Sec. 316) as follows:

''When the general owner·sells the property held in pledge, the purchaser necessarily takes it subject to the rights of the bailee; that is to say, he acquires the title to the property, including the remedies given by law for its protection. As purchaser, he is entitled to redeem on the same terms as the original owner. On a tender of the amount due, the pledgee must deliver up the property to him. A refusal to do so on demand is a conversion. The owner's right to sell the goods pending the pledge draws after it these rules of law. If the general owner become bankrupt, his assignee succeeds to his title and rights; the bailee retaining his lien unaffected. The same rule holds good where the bailee is summoned as a trustee of the general owner, or where an attachment is procured against him. The process takes effect subject to the rights of the bailee. It enables the plaintiff to reach the interest of the general owner, and nothing more. The officer cannot, unless authorized by statute, seize and sell the property. A factor under advances is a pledgee entitled to hold the goods; so that an attachment binds only the surplus.''

Under the assignment, therefore, Harper, as assignee, succeeded to the title and rights of Durfee & Sherman, the assignors. While he is not to be regarded as a purchaser for value, yet his rights are as great as his assignors had in respect to things transferred by the assignment. (Civil Code, Sec. 4521.)

By the assignment it was his right, and, if he deemed it best for the creditors, his duty to discharge the note due by Durfee & Sherman to the bank, and redeem and take possession of the stock pledged as collateral to secure its payment. It was also a duty of the assignee with all convenient diligence

to sell and dispose of the property assigned, which, as said before, included the stock pledged, at public or private sale, as he might deem most beneficial to the interests of the creditors, and convert the same into cash.

A sale at auction on November 29, 1898, was tried, and, although announcement was made that the sale would be for cash only, the bidder, the agent of the bank, was unable to pay the amount of his bid, or any considerable part thereof. The assignee had a clear right to set aside this sale, and he committed no violation of his trust in doing so.

Standing in the same position that his assignors had occupied towards the bank, as the assignee of the general title to the pledged stock, Harper had authority to sell the interest of his assignors, Durfee & Sherman, in the stock, subject always to the lien of the bank. This sale of their general property right could be made publicly or privately. The assignee finally chose to make it by the latter way. To this method the pledgee assented, and, to permit the assignee to deliver the stock to the buyer, the pledgee surrendered the certificates of stock to the assignee, who thereupon sold the entire holdings of his assignors in one block, receiving a sufficient consideration therefor, and the best then obtainable.

The agreement between the assignee and the bank that he could sell the pledged stock at private sale was a fair one. The original pledgors could have made any reasonable arrangement with the bank looking to the disposition of the stock for cash, and under the assignment the assignee could do the same with a like end in view.

The bank, by surrendering its actual possession to the assignee, in order that he might sell the stock, can scarcely be said to have waived its lien, where the rights of third persons, creditors, have not been prejudiced. The facts bring this feature of the case within the rule stated, as follows, by Jones (Pledges, Sec. 43):

"A pledgee may employ the pledgor as his agent to sell goods held in pledge, and he does not lose his lien by allowing the pledgor to contract in his own name for their sale, or by

delivering the goods on his order to the purchaser. By allowing the pledgor to contract in his own name, the pledgee takes the usual risk of such an authority; and, if the purchaser has paid the agent in full, the pledgee cannot reclaim the goods, nor recover the price, but will be compelled to look only to his agent for the proceeds. But he also retains the rights of a principal; and, by notifying the purchaser of these rights, he becomes entitled to receive the unpaid purchase money, in preference to his agent."

Surely, the bank never intended to waive its lien, and the delivery of the possession was in the best of faith, to permit all the stock to be sold and delivered by the assignee, still having due regard to the lien of the bank. In *Thayer* v. *Dwight*, 104 Mass. 254, the court said: "We do not understand that the pledgee loses his lien by permitting the pledgor to have possession or control of the property for a special and limited purpose, consistent with the enforcement of the lien, and not for his own use merely. The general owner may be the depositary of his own pledge. (Story, Bailm. Secs. 58, 230.) The formal possession of the depositary or agent is the legal possession of the depositor or principal."

The sale, as made by the assignee, was not a sale under the pledge, but one with regard to the rights of the pledgee. It was really a redemption by the assignee, and a delivery of the certificates by the bank to the assignee, in order to permit him to obtain money sufficient to redeem the pledge. And, as said, the assignee having had a right to redeem at law, and a right to sell at private sale under the assignment, we are unable to perceive how the assignors can complain that their rights have been impaired by any act of the assignee or the bank, or any one else, in the sale to the Thompson Investment Company.

3. Referring to the *mandamus* proceeding, it is said that *mandamus* will not issue to compel a corporation or its officers to issue a certificate of stock, where there is a dispute as to its ownership, especially in an action or proceeding like that at bar, to which the corporation itself is not a party. We shall not here lay down a precedent which will deny in all cases a

writ of mandate to compel a corporation or its officers to make transfer to a purchaser of shares of its capital stock upon its corporate books, or to compel a corporation, by its officers, to issue certificates of stock; but we do recognize the general principle that *mandamus* in such instances will not lie when other adequate and specific remedies may be had. And in this case, where the ownership of the stock was involved in the litigation, and where in the equitable action tried the relief sought could have been appropriately granted, *mandamus* was not the proper remedy. (High, Extr. Rem. Sec. 313; Cook, Stocks & S. Sec. 391; Mor. Priv. Corp. Sec. 215; Merrill, Mand. Sec. 160; *Freon* v. *Carriage Co.*, 42 Ohio St. 30; Beach, Priv. Corp. Sec. 657.)

That ample remedy could have been given in the injunction suit seems quite clear. Recovery for damages against Durfee would be inadequate compensation, for he is insolvent; and, remedy by *mandamus* being improper, a court of equity alone could grant the proper relief. In *Cushman* v. *Thayer Manfg. Jewelry Co.*, 76 N. Y. 365, it was expressly decided that an equitable action will lie to compel a transfer upon its books by a corporation of shares of its capital stock to the owner of the same. (See, also, Cook, Corp. Sec. 391.) And, if it could be compelled by the corporation, why could not an officer of a corporation be compelled to sign a certificate to make a transfer effectual? If the corporation itself has a claim upon the stock, its rights are not affected, because it is not a party to this suit; but it does not follow that, because it is not joined, one of its officers cannot be made to do a ministerial duty.

We observe that neither the corporation itself nor its secretary appears to be directly at fault. It is the president only, F. M. Durfee, who refuses to sign the certificate of shares to the purchaser. This is apparent by the pleadings in the injunction suit, wherein F. M. Durfee, the president, made D. M. Durfee, the secretary, a defendant; alleging that, unless injunction issued to him as secretary, he would transfer the stock sold by the assignee to the Thompson Investment Com-

pany. Under such a state of facts, the coporation itself is not a necessary. party to the suit. (Beach, Priv. Corp. Sec. 657; Cook, Corp. Sec. 391, note; *Gould* v. *Head*, 41 Fed. 240.) Thompson (Corp. Secs. 2440, .7572) cites *Gould* v. *Head*, *supra*, as if in doubt of its correctness, and refers to *Sayward* v. *Houghton and Riverside Irrigation Co.*, 82 Cal. 628, 23 Pac. 120, to support his doubt. That case was an appeal from an order granting a motion for a change of venue in an action to require Houghton to transfer certain shares of the irrigation company to plaintiff. We do not construe it as against the rule laid down above, for the Supreme Court affirmed the order, saying:

"There is nothing in the complaint showing, or tending to show, that the corporation. defendant is in any sense interested in this action. So far as can be seen from reading the allegations of the complaint, the attitude of the defendant corporation towards its co-defendant Houghton and the plaintiff is one of absolute indifference,—quite as much so as any stakeholder could be between conflicting claimants to a fund in his hands to which he had no claim himself. Not having any interest in the action which can be affected in any degree by the result of the trial, it makes no difference to the corporation defendant where the action is tried. Although not improperly made a party, the corporation defendant is not a party in interest. And it does not appear that it .has ever manifested any interest in the case. We think the corporation defendant is not a necessary party to the action. The plaintiff might obtain all the relief he demands without making it a party."

Here, as in the California case, the corporation seems indifferent, and, though its president and secretary were disagreeing with one another, neither thought that his company's attitude was one of interest in the suit; for neither asked to have it made a party thereto when the issues between the parties were being made up, or at any time thereafter.

The sequel of what we have said is that it was error in the District Court to issue the writ of mandate, for the relief sought by the defendants in the injunction suit could and should have been granted in the equitable action.

4.    Finally, counsel for appellant object to the purchase of the stock of the Sunrise company by the Thompson Investment Company, upon the ground that such purchase was beyond the powers of the Thompson Company.    We do not feel called upon to pass upon this contention, for the reason that it was not made in the lower court, hence is not properly for review here.    The case was tried below by all parties upon the theory that the Thompson company could buy the stock; the principal question having been whether it did so honestly and fairly, and without infringing upon the rights of Durfee & Sherman as pledgors and assignors.    We hold the sale was fair and legally made, and cannot now declare the purchase *ultra vires* of the buying corporation, and void.

The cause is remanded, with directions to the District Court to set aside the decree made, and to dismiss the proceedings in *mandamus*.    It is also ordered that a decree be entered in the injunction suit conforming to the views expressed in this opinion, and, when so made, judgment in defendants' favor in the injunction suit will be affirmed.    Each party to pay his or its own costs.

*Remittitur forthwith.*

PIGOTT, J., concurs.

BRANTLY, C. J.—I concur in the opinion and decision of the constitutional question passed upon, but, being disqualified as to all other points decided, and having taken no part in the hearing thereof, I express no opinion thereon.