IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 86-400

STATE OF MONTANA, ex rel.
Montanans for the Preservation
of Citizens' Rights, the Montana
State AFL-CIO; the WOMEN'S LAW
CAUCUS; TYNDALL COX; GARY HENRICKS
and PAM MCCLAIN, individually and
as next friend of her minor daughter,
FELICIA MCCLAIN,

     Plaintiffs & Relators,
     vs.

JIM WALTERMIRE, Secretary of
State of the State of Montana;
ANDREA BENNETT, State Auditor
of the State of Montana; ED
ARGENBRIGHT, Superintendent of
Public Instruction of the State
of Montana; and MIKE GREELY,
Attorney General of the State
of Montana as the BOARD OF
STATE CANVASSERS of the State
of Montana; and the STATE OF
MONTANA,

     Defendants & Respondents,
     and

MONTANA LIABILITY COALITION,
     Real Party in Interest.

FILED

JUL 7 - 1987

Ethel M. Harrison
CLERK OF SUPREME COURT
STATE OF MONTANA

OPINION AND ORDER
ON RECONSIDERATION

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Attorney General Mike Greely has filed a petition for rehearing following the issuance of our original opinion on May 22, 1987. The real party in interest, Montana Liability Coalition, has filed a petition for reconsideration, which we regard as a petition for rehearing. Jim Waltermire, Secretary of State, has filed a petition for clarification. Such a petition is not provided for in our rules, but we will regard it as a petition for rehearing. In any case, each petition is by the Court DENIED.

- 1 -

The petition of the Attorney General contends that the case of Durfee v. Harper (1899), 22 Mont. 354, 56 P. 585 was overruled by the 1972 Constitutional Convention; that publication of the "full text" of the proposed Initiative Amendment of the Constitution is not required by the State Constitution; that voiding the Initiative Amendment CI-30 is too harsh; and that the Court should fashion a relief such as requiring another election within 75 days under § 13-35-107, MCA, or certifying the issue for submission to the electorate at the next general election in 1988.

The petition of the real party in interest, Montana Liability Coalition, contends that our decision overturns the Initiative Amendment on a "slight procedural irregularity"; that our decision has the incidental effect of voiding all amendments to the Constitution (by initiative or referendum) since 1977; that the proceedings in the 1972 Constitutional Convention express the intent that full text publication of initiative amendments is not required; and that substantial compliance with statutory directions for publication and proposed initiative amendments is enough.

The Secretary of State's petition asks us to determine whether we should mandate a new election on the Initiative under § 13-35-107, MCA; and whether our decision now requires that any future constitutional amendment, by referendum or by initiative be printed in full on the ballot, as distinguished from the voter information pamphlet.

The relators have filed a response, answering in one instrument the contentions of each of the petitioners for rehearing. In their response, Relators contend that none of the petitions meet the requirements of Rule 34, M.R.App.Civ.P.; that it is inarguable that the language of the Initiative Amendment to Art. II, § 16, 1972 Mont. Const., filed by the Secretary of State after the election is not the same language submitted to the electors for their vote on November 4, 1986; that this Court pointed out in its original

majority opinion that no other amendment to the Constitution was affected by the decision herein; that the constitutional provision requiring printing the full text of a proposed initiative amendment in the media does not require publishing the full text of the proposed amendment on the face of the certified ballots; that the doctrine of strict compliance expressed in Durfee continues to be the law in this state; and that asking for a further election under § 13-27-501, MCA, or certifying a ballot for the general election of 1988 is asking for an advisory opinion on issues never raised, briefed or argued.

A petition for rehearing, to be sufficient, must, under Rule 34, M.R.App.Civ.P., be presented upon the following grounds and none other: that some fact material to the decision or some question decisive of the case submitted to counsel, was overlooked by this Court, or that the decision is in conflict with an expressed statute or controlling decision to which the attention of this Court was not directed. On their faces, the petitions do not meet that criteria. The majority opinion expressly sets out that it adopts the doctrines espoused in Durfee and like cases regarding constitutional amendments; that the true text of the proposed initiative amendment should be found in the Voter Information Pamphlet promulgated by the Secretary of State before the election; that publication by the Secretary of State of the full text of the proposed amendment is required under Art. XIV, § 9 of our Constitution; and that publication of the Attorney General's summary of the amendment (§ 13-27-312, MCA) expressed in 100 words or less did not in this instance meet the requirements for publication in the media. Yet, out of a decent respect for the concerns of the petitioners, which we take to be honestly expressed, we will discuss those few issues not glaringly found in the majority opinion itself.

Before we start, we assert one unassailable fact: Apart from the several thousand persons who may have seen the full text of the proposed amendment when they signed the initiative petitions and those few dozens of people who were intimately involved in these proceedings, the great majority of voters never saw the full text of the amendment CI-30 which the Secretary of State eventually certified had been adopted by their vote. What they did see in the Voter Information Pamphlet, their only source of information, was a text which completely reversed what the petitions for initiative amendment proposed. There is far more here than a slight "procedural irregularity" or a mere "cumbersome detail." The text in the Voter Information Pamphlet was as different from the text certified by the Secretary of State as yes from no, white from black or good from bad.

We turn first to the contention that the 1972 Constitutional Convention "overruled" Durfee v. Harper, supra.

The statement relied on by the Coalition regarding Durfee is found in the Constitutional Convention Proceedings regarding what is now Art. XIV, § 8, Amendment by Legislative Referendum. The Convention's Committee on Constitutional Revision had proposed two methods of amendment by the legislature, one by referendum, and one by the legislature itself. Eventually, the Convention eliminated amendment by the legislature itself. In the discussion respecting amendments by referenda, the Committee Report stated:

> . . . The first procedure . . . is analogous to the method of amending the Constitution in the present Constitution's, Art. XIX, § 9. The proposed section, however, does not go into the cumbersome procedural detail contained in the present Constitution. This cumbersome detail has been a burden to often-popular Constitutional change. In one instance the Supreme Court of Montana voided a proposed constitutional amendment for the slight procedural irregularity of failure to follow the Constitutional directive in Art. XIX, Section 9 and enter the proposed amendment in full in the

- 4 -

journals of both houses [Durfee v. Harper, 22 Mont. 354 (1899)].

1972 Montana Constitutional Convention, Vol. 1, at 361, 362.

The same committee report also contained the original proposal for amendment by initiative, the constitutional section with which we are concerned in this case. When speaking of the original proposal that 15% of the voters must sign such a petition for initiative amendment, the report said:

> . . . the proposed article creates a new power for the people of Montana, the right to initiate Constitutional amendments. The committee feels that this is an inherent right in a body politic whose Constitution is to be the embodiment of the will of the people. The committee's proposal sets up the exact machinery for expressing this will through establishment of the petition requirements and the administration process. The 15 per cent petition requirement and the geographical requirement are high, but the committee feels that it is not unreasonable to demand strict standards when dealing with something as fundamental and important as Constitutional change. Although the standard is high, the committee does not feel it is so high that pressing popular and needed Constitutional reforms could not be initiated by the people. The standard, the committee feels, will operate to check erratic whimsy.

1972 Montana Constitutional Convention, Vol. 1, at 363.

The initiative amendment proposal eventually was considered by the Convention sitting as a committee of the whole. It was in Committee of the Whole that the discussion occurred regarding whether the publication by the Secretary of State of proposed amendments by initiative should be solely in newspapers, or whether electronic media could be used. No definitive agreement was reached by the Convention on this question, but what is surprising is the report of the Committee of the Whole which was adopted by the Convention in the full committee report. Action of the Committee of the Whole on the initiative proposal was reported and adopted by the full Convention in this fashion:

. . . that Section 11 [the initiative proposal] be amended by striking the following: "in such event the secretary of state shall cause the amendment or amendments to be published in full in at least one newspaper in each county in which a newspaper is published, twice each month for the two months previous to the next general election for members to the legislative assembly;" that Section 11 be adopted as amended;. . .

1972 Montana Constitutional Convention, Vol. III, at 534.

The whole article with respect to constitutional revision was then referred by the convention to the Committee on Style and Drafting. When the proposal for amendment by initiative emerged from the Committee on Style and Drafting, the provision for publication by the Secretary of State, exactly as it now appears, had been reinserted. (1972 Montana Constitutional Convention, Vol. II, at 852, Report No. 2., February 26, 1972.) Thereafter the provisions sailed through Committee of the Whole (Vol. IV, at 1194) and through final vote (Vol. VI, at 1918-1919) in the same form.

The record of the Constitutional Convention proceedings therefore supports our statement in the majority opinion that "nowhere do the constitutional framers discuss publishing less than the full amendment." Indeed, the minority agreed, saying "that the official transcript of Montana's 1972 Constitutional Convention does not answer the question of intent conclusively; there is no statement of the collective view of the delegates." The foregoing recitation respecting the proceedings in the Constitutional Convention is burdensome but is made necessary by petitioner's contentions that somehow the convention had "overruled" Durfee. The Convention proceedings simply do not support that contention.

Next we turn to the contention of the relators that the majority opinion, by requiring publication of the full text of initiative proposals to amend the Constitution, have incidentally voided all amendments to the Constitutions since 1977, including a) the drinking age of adults (1978); b) optional local government review (1978); c) confidentality of

judicial documents in the Judicial Standards Commission (1950); d) a poll of the legislators to overthrow a gubernatorial veto (1982); e) discipline of judges for breach of canons of judicial ethics (1984); f) congressional redistricting (1984); and g) elimination of the study of the Salary Commission (1986).

This contention has caught the fancy of some observers and a few editorial writers who see all around us bogey-men threatening the structure of state government.

A short answer to this contention would be that an action to void an election must be commenced within 1 year of the date of the election in question (§ 13-35-107, MCA). A short answer will not suffice for what needs to be explained here.

In our majority opinion, we stated that we had examined the history of other constitutional amendments that have occurred since 1972 and that our decision in this case had no effect on such constitutional amendments.

The provisions of § 13-27-311, MCA, which purport to permit the Secretary of State to publish a "summary of the amendment as provided by the Attorney General" in advance of the election on an initiative amendment proposal came into the statute by way of the amendment in 1979 (Ch. 571, Laws of Montana (1979)). Before that time, § 13-27-311 required that the text of any proposed constitutional amendment, whether by initiative or by referendum, be published by the Secretary of State in at least one newspaper of general circulation in each county, twice each month for two months previous to the election. Therefore, if any constitutional amendment adopted prior to the effective date of Ch. 571, Laws of Montana (1979), had not been properly published, the defect would not arise from the majority opinion but rather from the failure of the Secretary of State to follow the law with respect to those amendments.

Since 1979, the only amendment to the Constitution proposed by means of an initiative which is affected by our decision is the one before us in this case. Another initiative proposal to amend the State Constitution also failed to muster a majority vote in 1986.

Our decision has no effect on amendments to the Constitution that may have been adopted through referendum from the legislature since 1979. As we pointed out in the majority opinion, there is no constitutional provision for publication by the Secretary of State or any other officer relating to amendments by legislative referendum. Art. XIV, § 8, 1972 Mont. Const. The majority opinion here can have no affect on such amendments. All of the amendments which the relators say are threatened by our opinion were legislatively-inspired and do not have their source in initiative. There is, therefore, no substance to the contention that we have incidentally voided other constitutional amendments.

But, the Secretary of State and the relators contend, our majority decision means not only that the full text of an initiative proposal for constitutional amendment must be published, but it also means that the full text of the initiative proposal must be stated on the face of the certified ballot given to each voter. Such a contention is an extrapolation of logic stretched to the fullest extent. Nowhere in the majority Opinion is there any indication that printing the full text of an initiative proposal on the face of the ballot is required nor was such a contention raised in any pleading or brief before the Court until the petition for rehearing. The majority Opinion has confined itself to the provisions of Art. XIV, § 9, that "the secretary of state shall cause the amendment to be published as provided by law, twice each month for two months previous to the next regular statewide election." By no means can consideration of that language be stretched to determine what should be on the face

of the ballot.   In point of fact, however, the majority opinion has given tacit approval to publishing the full text of the initiative proposal in the voter information pamphlet instead of the ballot, provided <u>that the full text is there correctly stated</u>.

Finally, we come to the contentions presented for the first time to us in the petitions for rehearing, that we should order a new election under § 13-35-107, MCA, or as the Attorney General suggests, certify the issue for the 1988 general election ballot.

There is a grave problem as to whether § 13-35-107, MCA, could apply to this type of case, especially where the officials through whom the errors occurred seem reluctant to admit any fault.[1]   In any event, § 13-35-107 is discretionary and the majority can see no equity in requiring the state to incur the costs of a special statewide election within 75 days of our majority opinion.   It is virtually certain that it would be impossible in that time to provide for the necessary publications in newspapers or other media and the other election requirements that would have to be followed. The suggestion defeats itself.   As for certifying the issue over for the 1988 ballot, we find no statutory authority for that step and it would stretch our inherent power to an

---

1    On October 29, 1986, an affidavit of the <u>Bozeman Chronicle</u> revealed that the Secretary of State had failed to cause <u>any</u> publication of the proposed amendment, either of the Attorney General's summary or the full text, in Gallatin County.   That county had 28,357 voters of whom 18,582 voted.   Votes for CI-30 were 9,735, against 8,046 in Gallatin County.   This disputable result was certified to the Secretary of State by the county election officials.   In spite of his record of nonfeasance on CI-30, the Secretary of State has persisted in the media in denouncing the decision of the majority as the work of "liberals" and "political" members of the court, and has accepted no responsibility for the fiasco.

unwarranted extent.   Each of those suggestions is therefore refused.

For the foregoing reasons, the petitions for rehearing, reconsideration, and clarification are each DENIED.

_____
                Justice

We concur:

_____

_____
                Justices

_____
Hon. Joseph B. Gary, District
Judge, sitting in place of
former Justice Frank B. Morrison,
Jr.

Mr. Justice Fred J. Weber dissents from the opinion and order on reconsideration.

The majority contends that an unassailable fact is that the great majority of voters never saw the correct text of the amendment CI-30 as finally certified. The error in the voter information pamphlet was that the words "this full" were printed this full, instead of this full. I emphasize that the pamphlet itself did not explain what is meant by underlining as compared to interlineation. While I agree that underlining commonly is used to designate material being added and interlineation to designate material being deleted, I suggest that the record does not demonstrate that this is knowledge which can be presumed to be held by all of the voters. The pamphlet itself contained the extensive printed arguments by the opponents to the measure which clearly set forth their opposition to the elimination of the words "this full" from the constitutional provision. I question that anyone who actually read the pamphlet would have been misled as to the positions of the opponents and the supporters of the amendment. The majority does not consider the publication by the Secretary of State which described the error in the voter pamphlets and was contained in a news release published throughout Montana. In addition, the majority does not consider the wide discussion of the Initiative in the printed media, the radio and the television, as well as the debate which was reported in the media. I conclude that the pamphlet gave the accurate information necessary for each voter to conclude whether to vote for or against the amendment. Nothing more was required. I conclude that there is no real basis for the declaration of unconstitutionality because of the pamphlet printing error.

The majority states that the record of the Constitutional Convention supports its statement that "nowhere do the constitutional framers discuss publishing less than the full amendment." It is true that the record of discussions by the delegates does not answer the question of this intention. However, I believe that the sections of the Constitution speak for themselves. Following is the full text of Art. XIV, § 8 and § 9:

Section 8. Amendment by legislative referendum. Amendments to this constitution may be proposed by any member of the legislature. If adopted by an affirmative roll call vote of two-thirds of all the members thereof, whether one or more bodies, the proposed amendment shall be submitted to the qualified electors at the next general election. If approved by a majority of the electors voting thereon, the amendment shall become a part of this constitution on the first day of July after certification of the election returns unless the amendment provides otherwise.

Section 9. Amendment by initiative. (1) The people may also propose constitutional amendments by initiative. Petitions including the full text of the proposed amendment shall be signed by at least ten percent of the qualified electors of the state. That number shall include at least ten percent of the qualified electors in each of two-fifths of the legislative districts.
    (2) The petitions shall be filed with the secretary of state. If the petitions are found to have been signed by the required number of electors, the secretary of state shall cause the amendment to be published as provided by law twice each months for two months previous to the next regular state-wide election.
    (3) At that election, the proposed amendment shall be submitted to the qualified electors for approval or rejection. If approved by a majority voting thereon, it shall become a part of the constitution effective the first day of July following its approval, unless the amendment provides otherwise. (Emphasis supplied.)

12

The case held to be controlling by the majority, State ex rel. Woods v. Tooker (1894), 15 Mont. 8, 37 P. 840, pointed out that the 1889 Constitution required publication in full for three months, and publication in Tooker was made for only two weeks. In view of that constitutional requirement it was reasonable for the Court to reach the decision it did in Tooker. In contrast, § 9(2) provides that the secretary of state shall cause the amendment to be published as provided by law. It is significant that the present Constitution does not include the words "in full" which were present in the 1889 Constitution and that in addition, the constitutional provision now requires publication as provided by law. Section 9(1) provides that the people may propose constitutional amendments by initiative and then states that petitions including the full text of the proposed amendment shall be signed by the electors. This demonstrates the ability of the delegates in the Constitutional Convention to clearly describe when full text is to be used. Those words are omitted from both paragraphs (2) and (3) of § 9 as well as from § 8. It is not necessary to read any Constitutional Convention proceedings to determine intent. The intent seems quite clear from § 9(2) itself. There is no requirement for publication "in full" in our present Constitution.

I conclude that the Montana Liability Coalition (Coalition) has presented a strong argument with regard to the effect of the majority opinion. In substance, the Coalition questions whether the definition of "the amendment" as meaning "the full text of the amendment" for § 9(2) of our Constitution can also be applied to § 8. In § 8 the provision for submitting to the electorate an amendment proposed by the legislature itself is that "the proposed amendment" shall be submitted to the electors. In a similar manner, § 9(3) provides that so far as submitting the initiative to vote is

13

concerned, "the proposed amendment" shall be submitted to the electors. In analyzing § 9(2) of the Constitution, the majority concludes that the words "the amendment" mean that the full text of the amendment must be published. The majority fails to explain why the full text should be published while adjacent paragraphs should be construed to require only a summary. The Coalition argues that the same logic as used by the majority can be applied to § 8, raising a question as to referendums because in no instance was the proposed amendment submitted in full to the electors. Instead only a summary was used on the ballot. Similarly, under § 9(3), the proposed amendments were not submitted in full to the qualified electors but were submitted in summary form only. I conclude that the Coalition has raised a significant question which follows from the majority interpretation of our Constitution. The purpose of publication and printing on the ballot is to provide adequate information to Montana voters. That purpose is not fulfilled by the fact that members of the legislature have considered the matter. I conclude that it can be argued that the conclusion of the majority could be applied to both § 8 and § 9(3) of the Constitution, requiring invalidation of referendum and initiative measures where the proposed amendment was not set forth in full in the ballot.

The majority has stated that § 13-35-107, MCA, sets forth a one-year statute of limitations on actions to void an election ballot. I am not certain that the provision could be applied to a constitutional challenge.

For the foregoing reasons I would grant the petitions for rehearing and reconsideration.

_____
Justice

14

Chief Justice J.A. Turnage and Justice L.C. Gulbrandson concur in the foregoing dissent.

_J. A. Turnage_
Chief Justice

_L.C. Gulbrandson_
Justice