## GODFREY v. McCONNELL et al.

(Circuit Court, D. Montana. December 21, 1906.)

### No. 133.

1. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

A bill by a stockholder on behalf of himself and any other stockholders who might join, against directors of the corporation and others, alleging a conspiracy to defraud the corporation pursuant to which contracts were entered into giving the defendants the right to do exploration work in the mines of the corporation, and indebtedness was incurred on which judgments were obtained under which the property of the corporation was sold, where neither a discovery nor accounting, nor the setting aside of the contracts, judgments, or sale is sought, but a money judgment for damages only is prayed for, does not state a cause of action within the jurisdiction of a federal court of equity, but one for which there is a plain, adequate, and complete remedy at law.

2. CORPORATIONS—SUIT BY STOCKHOLDER—GROUNDS FOR EQUITABLE RELIEF.

Certain officers and directors of a mining corporation which had closed down its mines because their operation was unprofitable, and which was indebted and without funds, as individuals, entered into a contract with a syndicate of which some of them were also members by which the syndicate agreed to furnish the money to do exploration work in the mines under direction of the company's superintendent, and was given an option to purchase a large amount of the company's stock which such officers and directors owned or controlled. The directors also made a contract with the syndicate on behalf of the company by which such exploration work was permitted. The work was done, and some new veins were opened, but the syndicate did not exercise its option. In the meantime the superintendent acting on behalf of the company put its mill in repair and commenced working the ore so found, but it proved unprofitable, and additional indebtedness was contracted. Subsequently judgments were re-

covered on that and the prior indebtedness under which the company's property was sold. It did not appear that there was any conspiracy to defraud the company, or fraud in fact, but, on the contrary, that the contracts were intended for the company's benefit. Nor was there any question as to the validity of the judgments or sale. *Held* that, even conceding that the contract made by the directors was voidable, in the absence of any conspiracy or actual fraud there was no ground upon which a court of equity could entertain a suit by a stockholder to recover a money judgment for damages against the directors or members of the syndicate.

## In Equity.

. Suit by A. K. Godfrey, a citizen of Minnesota, on behalf of himself and all other stockholders in the defendant Sunrise Mining & Milling Company, who may seek relief and contribute. There are about 100 shareholders. The bill was filed on September 6, 1900. It is alleged that the Sunrise Mining & Milling Company is capitalized in the sum of $2,500,000, divided into 500,000 shares at a par value of $5 each. Complainant owns 1,900 shares, which he bought in 1894 and 1895. It is alleged that about January 20, 1898, the defendants Joseph H. Harper, Angus A. McDonald, David M. Durfee, and Frank M. Durfee, and the following named persons, not defendants, Vincent Smith, Edgar I. Holland, and Frank D. Brown, were elected as directors of the Sunrise Mining & Milling Company (which, for brevity, will be hereafter referred to as the Sunrise Company); that about January 20, 1899, David M. Durfee resigned, and William E. Moore was elected in his place; that Vincent Smith also resigned about the same time, and no successor to him has been elected, so that since July, 1899, the board of directors of the Sunrise Company has been composed of Joseph H. Harper, Frank M. Durfee, and Angus A. McDonald, defendants herein, and Frank D. Brown, Edgar I. Holland, and William E. Moore, who are not defendants. It is alleged that in February, 1899, one C. D. McLure, then a stockholder, demanded of the officers and trustees of the Sunrise Company that they should, in the name of the company, and for its benefit, commence an action against William Thompson, and the defendants Henry Williams, J. L. Hamilton, J. H. Harper, A. A. McDonald, M. L. McDonald, F. M. Durfee, and D. M. Durfee, and also against F. W. Sherman and W. R. Kenyon, to recover from them damages which the defendant Sunrise Company had suffered by reason of the wrongful, illegal, and improper acts of the persons named, and for conspiracy, and for the recovery of moneys lost to the company by reason of the wrongs of the said persons, and for the recovery for the loss of moneys and properties to the Sunrise Company, on account of the wrongful acts of the said persons; but that the directors of the company refused to bring the action. It is alleged that thereupon the complainant appointed Frank D. Brown his agent and attorney in fact to demand of the Sunrise Company and of the directors of the company that they commence an action in the name of the company, and for its benefit, and against the said William Thompson, and the defendants Henry Williams, James L. Hamilton, Joseph H. Harper, Malcolm L. McDonald, A. A. McDonald, Frank M. Durfee, and D. M. Durfee, and the said F. W. Sherman and W. R. Kenyon, or any of them, to recover for the damages sustained by the company, by reason of the wrongs of the persons just mentioned. It is alleged that said Frank D. Brown had ascertained the wrongs done to the company by the defendants named, and frequently informed the defendants J. H. Harper, A. A. McDonald, D. M. Durfee, F. M. Durfee, and each of the other members of the board of directors, prior to and at the time of his appointment as agent of the complainant, of the wrongs complained of, and urged them to hold a meeting of the board of directors to investigate the same, for the purpose of determining whether action should be brought to obtain redress, but that no meeting has been held, except one about July, 1899, and one held on April 13, 1900, at which the matters complained of were discussed, but no action was taken, and that ever since the board has refused to call a meeting, or to consider the wrongs done to the company; that complainant about March 28, 1900, addressed a letter to the members of the board, requesting that action be brought, and furnished the directors with the evidence and facts necessary to sustain an action; and that thereafter the board called a meeting to consider whether

the company could bring an action to recover for the injury and damages it had suffered through the acts of the defendants above named, but that by resolution the board refused to bring any action against the defendants herein mentioned.

Complainant alleges that at the time he commenced his action in September, 1900, the directors of the company were defendants Harper, A. A. McDonald, and F. M. Durfee, and, of persons not defendants, E. I. Holland, William E. Moore, and F. D. Brown, and that, as the defendants who were directors were parties to the wrongs against the defendant Sunrise Company, no action will be taken by the board in the name of the company to investigate the wrongs done, and to recover damages therefor. It is further alleged: That on January 20, 1897, at a meeting of the stockholders of the defendant Sunrise Company, the following named persons were elected directors: J. H. Harper, F. W. Sherman, M. L. McDonald, David Sterrett, A. A. McDonald, D. M. Durfee, and F. M. Durfee, all of whom qualified and remained as directors until January 20, 1898, and that immediately after the election of the above-named persons as directors a meeting of the board of directors was held, and F. M. Durfee was elected president of the company. That at said time, and up to and including March 17, 1897. F. M. Durfee and F. W. Sherman, jointly and in the name of Durfee and Sherman, owned and held 300,000 shares of the capital stock of the Sunrise Company, of which they had pledged to the Merchants' and Miners' National Bank of Philipsburg 127,029⅔ shares, which were held by the bank as collateral for an indebtedness of the said Durfee and Sherman to the said bank, and the remaining 138,371 shares were held by the defendant J. H. Harper, as assignee of Durfee and Sherman, and in trust for the creditors of Durfee and Sherman, and that on March 17, 1897, A. A. McDonald was the president of the Merchants' and Miners' National Bank. That the defendant J. H. Harper, upon said date, was personally the owner of 2,500 shares of the stock of said company, and that upon said date the said M. L. McDonald was the owner of 3,000 shares.

It is alleged: That on March 17, 1897, the defendants J. H. Harper, M. L. McDonald, A. A. McDonald, and F. M. Durfee entered into a contract, to which said contract the said Merchants' & Miners' National Bank, by A. A. McDonald, and J. H. Harper, personally and as assignee for Durfee and Sherman, M. L. McDonald, Robert McArthur, David Sterrett, and Mrs. F. W. Sherman, wife of F. W. Sherman, were parties of the first part, and the said William Thompson, and the said defendants, Henry Williams, J. L. Hamilton, and J. H. Harper, and the said F. W. Sherman and W. R. Kenyon, were parties of the second part. That, by the terms of this contract, the parties of the first part agreed to sell and convey to the parties of the second part 300,000 shares of the stock of the Sunrise Company, then held, and recited by said agreement to be held, as follows: Merchants' & Miners' Bank 127,029⅔ shares, held by the bank as collateral for the debts due it by Durfee and Sherman: Joseph H. Harper, personally, 2,500 shares, and as assignee of Durfee and Sherman 138,371 shares; M. L. McDonald 3,000 shares; Robert McArthur 1,500 shares; David Sterrett 3,000 shares; and Mrs. F. W. Sherman 2,100 shares. That in this agreement it was provided that all of the said stock was to be placed in escrow in the said Merchants' and Miners' Bank, and that the parties of the second part to the agreement were to work and explore the mining claims belonging to the Sunrise Company for four months from April 1, 1897, and to pay to the bank on or before July 11, 1897, $2,083.76, to be applied on the Durfee and Sherman interest, due to the bank on the indebtedness of Durfee and Sherman to said bank, and to pay to defendant J. H. Harper, as trustee for some person or persons unknown to complainant, $334.73, and to pay to defendant J. H. Harper, as assignee for Durfee and Sherman, by November 11, 1897, $19,341.31, and to pay to defendant J. H. Harper for the persons unknown to complainant, $2,745.95. That the agreement referred to further provided that in case the parties of the second part failed to work the mines mentioned in the agreement, as provided, or to make the payments promptly, as provided therein, the first parties might at their option declare the contract void, and take immediate possession of the stock mentioned therein. That on the same date, and, as a part of the scheme to injure and wrong the defendant Sunrise Mining & Milling Company and the

151 F.—50

stockholders thereof, the defendants F. M. Durfee, A. A. McDonald, J. H. Harper, M. L. McDonald, and D. M. Durfee, and the said David Sterrett and F. W. Sherman, the latter two not defendants, directors of the company at that time entered into an alleged and pretended contract in behalf of the company, to which contract the company was made by the directors party of the first part, and the said William Thompson, and the defendants Henry Williams, J. L. Hamilton, and J. H. Harper, and the two persons, W. R. Kenyon and F. W. Sherman, not defendants, were made parties of the second part, which agreement referred to the agreement just hereinbefore mentioned, and by the terms of which agreement it was provided that the Sunrise Mining & Milling Company agreed that the said second parties might work, explore, and develop the mines belonging to the said company, under the supervision of the said F. W. Sherman, as superintendent of the company, the second parties to work not less than five men, and not less than 25 days a month. That it was further provided in said contract that if the parties of the second part should purchase the stock under the agreement above mentioned, then the amount by them spent in developing and exploring the mine should be a charge on the said Sunrise Mining & Milling Company; but if the second parties should fail to work the mine, as agreed, or fail to take the stock, as provided in said agreement, then the amounts were not to be a charge on the company in whole or in part.

Complainant alleges that no authority was ever given to the board, or any of its members, by the stockholders to make any agreements referred to, and that no meeting of the stockholders was ever held at which said agreement was ever spoken of, and that the agreement was contrary to law; that F. W. Sherman was not the superintendent or general manager of the Sunrise Mining & Milling Company, when the agreement was made; that William Thompson and the defendants J. H. Harper, personally and as assignee, M. L. McDonald, A. A. McDonald, D. M. Durfee, F. M. Durfee, Henry Williams, and J. L. Hamilton, and the said W. R. Kenyon, F. W. Sherman, and David Sterrett, then and there conspired to wrong, cheat, and defraud the Sunrise Company of its property, and thereby and by the agreements above mentioned to deprive the company and the stockholders of their rights and interests. It is alleged that immediately after March 17, 1897, and in furtherance of the conspiracy alleged, William Thompson, and the defendants J. H. Harper, Henry Williams, and J. R. Hamilton, and the said W. R. Kenyon and F. W. Sherman, under the pretended authority contained in the contract, took possession of the properties of the company, and worked the mines, and took ores therefrom, and contracted a large debt for labor and material furnished them—the sum of $7,575.60—and thereupon refused to pay for the stock in said agreement above mentioned, and surrendered all their rights under said agreement, and refused to pay the indebtedness by them incurred and contracted while so in possession of the properties.

Complainant further alleges that about August 19, 1897, the said F. W. Sherman, as agent for William Thompson, and the defendants A. A. McDonald, D. M. Durfee, J. H. Harper, Henry Williams, F. M. Durfee, and J. L. Hamilton, and the said W. R. Kenyon and David Sterrett, induced and procured Helen C. Harper, Mr. Baker, J. H. Harper, Montana Hardware Company, Marie Wood, May Sterrett, Holter Hardware Company, J. A. Spencer, Sanders & Sanders, M. E. Edwards, Eve E. Durfee, Big Blackfoot Mining and Milling Company, and J. A. Spencer & Son, to commence actions against the Sunrise Company for various sums specified in the bill, and to levy attachments upon the property of the company; and that F. W. Sherman, in his own behalf and in behalf of the said W. R. Kenyon and David Sterrett and William Thompson and the defendants A. A. McDonald, M. L. McDonald, D. M. Durfee, F. M. Durfee, Henry Williams, J. H. Harper, and J. L. Hamilton, filed certain liens of laborers, who had worked for the said F. W. Sherman, W. R. Kenyon, and David Sterrett, and for the defendants Henry Williams, J. L. Hamilton, and J. H. Harper, and the said William Thompson, while they were in possession of the property under the agreement aforesaid. It is alleged that the actions referred to were brought against the company by the persons aforesaid for goods furnished to F. W. Sherman, W. R. Kenyon, J. H. Harper, J. L. Hamilton, and William Thompson, and used by them in compliance with the terms

of the contract, and that judgments were obtained by the persons who brought the suits, and that none of the goods and merchandise for which the actions were brought were furnished to the company. It is alleged that W. R. Kenyon, F. W. Sherman, and William Thompson, and the defendants Henry Williams, J. L. Hamilton, J. H. Harper, A. A. McDonald, M. L. McDonald, F. M. Durfee, and D. M. Durfee, by means of the contracts aforesaid and the judgments and liens by them procured to be filed against the company, conspired to deprive the company of its property and of the means of redeeming the property from any sale which might be had under just and valid claims. It is further alleged that about June, 1898, the said F. W. Sherman, W. R. Kenyon, and William Thompson, and the defendants A. A. McDonald, M. L. McDonald, D. M. Durfee, F. M. Durfee, Henry Williams, J. H. Harper, and J. L. Hamilton, in furtherance of said conspiracy, caused execution to be issued on the judgment obtained by Helen C. Harper against the Sunrise Company, and to have execution levied upon the property, and thereafter, on July 2, 1897, caused all the property of the company to be sold by the sheriff of Granite county, under execution, and caused the same to be bid in by the said William Thompson, for and on behalf of the said W. R. Kenyon and F. W. Sherman, and William Thompson, and the defendants A. A. McDonald, M. L. McDonald, D. M. Durfee, F. M. Durfee, Henry Williams, J. H. Harper, and J. L. Hamilton. It is alleged that thereafter, in January, 1898, the corporation, by its directors, endeavored to procure a loan sufficient to redeem the property; but by reason of the unlawful and illegal indebtedness of record against the company was unable to do so, and the company was unable to redeem all or any of its property so sold under execution. It is alleged that the company at the time mentioned owned certain valuable mining claims, consisting of 24 quartz lode mining claims, together with a mill site, mill, office buildings, and other buildings, which were and are of the value of $600,000 and over; that all of the property was sold under the execution issued in the action brought by Helen C. Harper against the company; that the actual value of the shares of stock of the company at the time of the wrongs complained of was at least $1.20 a share, and the value of the stock held by this complainant at the time was at least $2.040, but that by reason of the wrongs done, as aforesaid, the stock is valueless, and the company has been deprived of all its interest in and to its properties. It is alleged that David Sterrett died in December, 1897; that W. R. Kenyon is a resident of the state of New York; that F. W. Sherman is a resident of Utah; and that William Thompson died May 16, 1900, and that letters of administration of his property have been issued to the defendant O. J. McConnell.

Complainant alleges that F. D. Brown, E. I. Holland, and W. E. Moore did not know of the fraudulent acts hereinbefore set forth until January, 1899; that complainant never knew of said fraudulent acts until May, 1899. The prayer is for a discovery, and that the court may assess against the defendants O. J. McConnell, administrator of the estate of William Thompson, Henry Williams, J. L. Hamilton, J. H. Harper, A. A. McDonald, M. L. McDonald, F. M. Durfee, and D. M. Durfee, all the damages which the Sunrise Company and the stockholders thereof have sustained by reason of the matters and things set forth; and that defendants be adjudged to pay such sums to the defendant company, and for further relief.

The defendants O. J. McConnell, administrator of the estate of William Thompson, deceased, Henry Williams, J. L. Hamilton, J. H. Harper, A. A. McDonald, M. L. McDonald, and David M. Durfee filed a joint and several answer. They admit the allegations of the complainant's bill as to the directorate of the company in January, 1898, and in July, 1899. They deny that C. D. McLure ever requested action to be brought, as alleged by complainant; but allege that in February, 1899, Frank D. Brown, pretending to be the attorney in fact of C. D. McLure, served a notice upon the directors of the company, notifying them to attend a meeting of the trustees of the company alleged by him to have been called to authorize the directors of the company to bring an action in the name of the company to set aside certain judgments alleged to have been fraudulently obtained against the company, and to bring an action against the directors who were responsible for the alleged fraudulent judgments having been obtained. The defendants deny that they

ever consented to any fraudulent judgments having been obtained, and deny that any fraudulent judgments were obtained, and deny that F. D. Brown ever urged upon the defendants to hold a meeting of the directors to investigate the alleged wrongs. They admit that defendants J. H. Harper, M. L. McDonald, and A. A. McDonald refused to call a meeting for the purpose of considering ·the alleged wrongs described in the complaint, and admit that the complainant has made an effort to induce the trustees to bring an action for the purposes set forth in the complaint, and that he wrote a letter to them, as alleged in his complaint; but deny that he made any other statement to them, or acquainted them with any facts or evidence upon which the alleged cause of action is founded, or of any matters necessary to be known by defendants, to enable them to bring such action, other than the facts alleged which were contained in the letter he wrote. Defendants admit that they are not willing to authorize any one in the name of the Sunrise Company, or in its behalf, to make any investigation of the alleged wrongs set forth in the complaint. and are not willing to bring any action for such alleged wrongs; but deny that they. or any of them, have been parties to any wrongs against the corporation. They admit that J. H. Harper and A. A. McDonald will not consent to the bringing of any action for the recovery of damages in behalf of the Sunrise Company for the alleged wrongs, for the reason that such action would be useless and unjust. They deny that at the time of the meeting of the trustees on January 20, 1897, or up ,to of including March 17, 1897. F. M. Durfee or F. W. Sherman, jointly or in the name of Durfee and Sherman, were the owners or holders of 300,-000 shares of the capital stock of the Sunrise Company; but admit that F. M. Durfee and F. W. Sherman, jointly, and in the name of Durfee and Sherman, were the owners of (except as modified by the assignment for the benefit of creditors hereinafter referred to) 265,400⅔ shares of the capital stock of the Sunrise Company, of which they had pledged to the Merchants' and Miners' National Bank, of Philipsburg, 127,029⅔ shares as collateral se- ·curity for an indebtedness of Durfee and Sherman to the said bank, and of which the remaining 138,371 shares were held by the defendant J. H. Harper. as assignee of Durfee and Sherman, in trust for the creditors of Durfee and Sherman. They admit the contract of March 17, 1897, in which the Merchants' & Miners' National Bank, A. A. McDonald, J. H. Harper, personally and as assignee of Durfee and Sherman, M. L. McDonald, Robert McArthur, David Sterrett, and Mrs. F. W. Sherman, wife of F. W. Sherman, were the parties of the first part, and William Thompson, and defendants Henry Williams, J. L. Hamilton, and J. H. Harper, and F. W. Sherman and W. R. Kenyon were the parties of the second part—this contract having been the one for the sale and conveyance to the second parties of 300,000 shares of the stock of the Sunrise Company, which was to be placed in escrow in the Merchants' & Miners' Bank, and in which contract it was agreed that the parties of the second part were to work and explore the claims for four months from April 1, 1897, and to pay to the bank and the defendant J. H. Harper certain sums to be applied as alleged in the complainant's complaint.

The defendants also admit that on the same day F. M. Durfee, A. A. McDonald, J. H. Harper, M. L. McDonald, and D. M. Durfee, and David Sterrett and F. W. Sherman, directors of the Sunrise Company, entered into the contract pleaded by the complainant, in which the Sunrise Company was party of the first part, and William Thompson, J. L. Hamilton, J. H. Harper, Henry Williams, W. R. Kenyon, and F. W. Sherman were parties of the second part, by the terms of which the Sunrise Company agreed that the second parties might work, explore, and develop the mines under the supervision of F. W. Sherman as superintendent of the company, all as alleged in complainant's bill. But they deny that the last-named contract was executed subsequent to the contract and agreement first named, and aver that they were parts of one and the same transaction; and they deny that the contract last described was a part of any scheme to injure or defraud the company or the stockholders. They admit that there was never a meeting of the stockholders held prior to the making of the said agreement; but deny that the board of directors had no authority to enter into the agreement, and aver that the directors had legal authority to enter into the contract.

They deny that F. W. Sherman was not at the time of making the agreement the superintendent or general manager of the Sunrise Company, and allege that he was the superintendent and general manager thereof until October, 1897. They deny all allegations of conspiracy or wrong. They admit that immediately after March 17, 1897, William Thompson, J. H. Harper, J. L. Hamilton, Henry Williams, W. R. Kenyon, and F. W. Sherman, under the authority contained in one of the contracts referred to, took possession of the properties of the company; but they deny that they ever extracted any ores from the mines, except to remove such ores from the tunnels in which the second parties were working and performing exploration work to the outer surface as was necessary to do the exploration work, and deny that they ever operated the mills belonging to the company for the purpose of reducing the ores extracted, or that they contracted a large amount of indebtedness or any indebtedness for labor and material furnished, in the sum of $7,575, for such purpose, as alleged. They admit that the second parties refused to pay for the stock in the agreement mentioned, and surrendered all their rights; but deny that they refused to pay the indebtedness by them incurred while in possession of the property, and aver that they fully paid all indebtedness by them incurred under the contract. They deny all the allegations of complainant to the effect that in pursuance of a conspiracy Helen C. Harper and others were induced to commence actions against the Sunrise Company: admit that such actions were commenced, and judgments were recovered as set forth in complainant's bill, and that attachments were levied upon the property of the Sunrise Company, but deny that F. W. Sherman, in his own behalf, or in behalf of any one else of the defendants or parties to the contract, caused liens to be filed; deny that actions were brought against the company, as alleged, for goods used by the defendants named in the contract, in compliance with the terms of their contract; admit that actions were commenced, and aver the truth to be that the goods, for the value of which suits were brought, were all furnished to the defendant company at its instance and request, and admit that valid judgments were had against the Sunrise Company: deny all allegations of a conspiracy in connection with the levy of the judgment obtained by Helen C. Harper against the Sunrise Company; admit that the Sunrise Company owns mining claims, as alleged. but deny that the value was or is $600,000, and allege that at the time of the making of the contracts and now the property does not exceed in value the sum of $12,000; admit that the property was sold under execution in the action brought by Helen C. Harper, and deny that the value of the stock of the company at the time of the alleged wrongs set forth in the complainant's bill was $1.20 a share, or any greater amount than two cents a share; and deny that complainant's stock was of any greater value than $38, and deny that any wrong has been done the company or the complainant. Defendants allege that F. D. Brown, E. I. Holland, and Wm. E. Moore had full knowledge and means of knowledge of all the acts done by the defendants, which the complainant alleges were fraudulent, for a long time prior to January, 1899, and aver that at the meeting of the stockholders on January 20, 1898, F. D. Brown and E. I. Holland had full knowledge and means of knowledge of the existence of the liens and judgments; and aver that complainant should not be heard to dispute the validity of the labor liens as claims against the company, as the annual meeting was duly called, and complainant had due and legal notice of the same, and failed to attend the meeting; and aver that the stockholders had the means of knowing and did know that the labor liens had been recognized by the board of directors as valid, that the Sunrise Company had promised to pay the liens, and that the complainant has been guilty of laches in not attending the meeting and ascertaining the affairs of the company. Defendants aver that it is immaterial whether complainant knew of the acts which he claims were fraudulent until May, 1899, or not.

For further answer defendants aver that on and prior to May 11, 1896, F. W. Sherman and F. M. Durfee, composing a partnership of Durfee and Sherman, owned more than one-half of the capital stock of the Sunrise Company, and that on said date they made an assignment for the benefit of their creditors to Joseph H. Harper; that the principal asset of the estate assigned

was the controlling interest in the Sunrise stock; and that about September 1, 1896, the Sunrise Company became indebted to its employés in the sum of $2,000, but was without funds to pay; that the most valuable ore theretofore developed in the mines of the company and all of the ore that could be worked at a profit in the mill had theretofore been extracted and worked in the mill, and that the mines and mill were being operated at a loss; that the company was without credit to borrow money; that the stock was not assessable; and that Harper, as assignee, had no funds with which the debts of the company could be paid; that thereafter Helen C. Harper purchased and held the claims of the employés, and the claims so purchased constituted the causes of action against the Sunrise Company, upon which Helen C. Harper subsequently obtained the judgment against the company referred to in complainant's bill. Defendants allege that between May 11, 1896, and March 17, 1897, J. H. Harper, as assignee, tried to find a purchaser for the Durfee and Sherman stock, but could not do so, owing to the indebtedness of the company and to the complete exhaustion of all profitable ore in the mines; and that the company was without means necessary to perform exploration work whereby other bodies of profitable ore might be developed. Defendants allege further that on March 17, 1897, William Thompson, Henry Williams, J. H. Harper, W. R. Kenyon, and J. L. Hamilton, referred to by the defendants as the "Butte Syndicate," at the solicitation of F. W. Sherman, as superintendent of the company, and upon his representation that exploration and development work in the mines would probably discover large bodies of valuable ore, were induced and did take an option upon about 300,000 shares of the capital stock of the company, by virtue of the contract and agreement first described in complainant's bill; and that on the same day, and as part of the same transaction, the Butte Syndicate entered into a contract with the Sunrise Company, being the second contract described in complainant's bill, by which the Syndicate agreed to expend $500 per month for four months in performing exploration work under the supervision of F. W. Sherman, as superintendent of the company; that under the last-described agreement the Butte Syndicate acquired no right to remove the ore developed by them, nor to operate the mill belonging to the company, and that the syndicate did not remove any ore belonging to the company. Defendants allege that the privilege given the syndicate by the contract in no manner limited the right of the company to perform work on its own account, and to extract and remove the ore discovered by the syndicate. It is alleged that the syndicate performed the conditions of the contract, and that the work opened up extensive bodies of valuable ore, and that Sherman, as superintendent, with the knowledge and authority of the board of directors, began the extraction and stoping of ore for the purpose of milling the same, graded a wagon road, built a tramway, and made other improvements; that the syndicate did not authorize these improvements, nor were they in any manner liable therefor by the terms of their contract with the Sunrise Company; that some of the work and improvements were in progress contemporaneously with the exploration work performed by the Butte Syndicate, but that F. W. Sherman kept separate accounts of the two classes of work.

Defendants further allege that by express authority of the Sunrise Company the mill started in August, 1897, upon ore mined and conveyed by the company; that for some reason unknown to the defendants the values in ores could not be saved in the mill, and the mill was being operated at an increasing loss. The defendants admit that on August 19, 1897, Helen C. Harper, Baker, Harper, Montana Hardware Company, David Sterrett, and Marie Wood began suits against the company, and attachments followed; but deny that the suits were procured to be brought against the company by F. W. Sherman, in any other sense than that Sherman, prior to the bringing of the actions, informed said plaintiff creditors of the failure of the mill to save the values in ore. Defendants aver that all of the labor liens described in complainant's bill as having been filed with the sheriff of Granite county was for labor which had been performed by the several lien claimants on the Sunrise Company, with certain exceptions, as follows: They aver that prior to August 19, 1897, F. W. Sherman, without the knowl-

dge of the Butte Syndicate, had paid certain claims against the Sunrise Company out of the funds furnished by the Butte Syndicate to Sherman, for the purpose of paying for work done under their contract with the Sunrise Company, and that after said attachments were levied—to wit, on or bout the 20th of August, 1897—and as an offset to the amount of funds hus diverted and paid for the use and benefit of said company, F. W. Sherman permitted claims to an equivalent amount to be filed as liens against the defendant company, for which the said Butte Syndicate would otherwise have been liable; that said offset was made by Sherman without the knowledge of the Butte Syndicate, and subsequently, in November, 1897, the board of trustees of the company were fully informed of the facts relating to the offset, and consented thereto.

The complainant, through his counsel, upon September 26, 1902, filed a bill of revivor, and after setting forth generally the nature of the action alleged the death of Henry Williams, one of the defendants, and the issuance of letters of administration to Rachael E. Williams on August 12, 1902, and prayed for an order of revivor. Rachael E. Williams, as administratrix of the estate of Henry Williams, deceased, filed a plea in answer to the complainant's bill of revivor, setting forth that Henry Williams died about July 8, 1902, that she was duly appointed administratrix, and that by reason of the death of Henry Williams the alleged cause of action against him abated and ceased to exist, under the law, and that the bill of revivor should be dismissed, with judgment in her favor. Complainant filed replications averring that he would prove his bill to be true and sufficient.

The case was referred to a special master to hear the evidence and to decide all the issues between the parties, and make a report to the court from and upon the evidence, separately stating findings of fact and law. The special master found the corporate existence of the Sunrise Company, as alleged, found the death of William Thompson, and the appointment of defendant O. J. McConnell as administrator of his estate, found the death of Henry Williams, and the appointment of Rachael E. Williams as administratrix, found the death of Frank M. Durfee, found the capital stock of the corporation to have been $2,500,000, divided into 500,000 shares of the par value of five dollars a share, found that the complainant owned 1,900 shares, and that the suit was not collusive to confer jurisdiction upon the United States court. The special master also found that on January 20, 1898, defendants J. H. Harper, A. A. McDonald, D. M. Durfee, and F. M. Durfee, and the following named persons: Vincent Smith, E. I. Holland, and F. D. Brown, were elected, at a meeting of the stockholders of the Sunrise Company, directors and accepted and qualified; that D. M. Durfee resigned about January 20, 1899, and that William E. Moore was elected as his successor and qualified; that in July, 1899, Vincent Smith resigned as director, but that no successor was named; that since July, 1899, the directors of the company were J. H. Harper, F. M. Durfee, who has died since the commencement of the action, and A. A. McDonald, who were defendants in this action, and the following named persons, not defendants: F. D. Brown, E. I. Holland, and W. E. Moore; that C. D. McLure, in February, 1899, was a stockholder, and made demand upon the trustees of the company that they should, in the name of the company, commence an action against William Thompson, Henry Williams, J. L. Hamilton, J. H. Harper, A. A. McDonald, M. L. McDonald, F. M. Durfee, D. M. Durfee, F. W. Sherman, and W. R. Kenyon to recover damages which the company had suffered by reason of their wrongful, illegal, and improper acts, and for moneys and property lost to the company by reason of their wrongful acts; but that the trustees refused always to bring the action; that thereafter, about March 28, 1900, complainant caused his attorneys, Messrs. Toole, Bach, and Toole, to address a communication to the board of trustees of the Sunrise Company requesting that action be brought in the courts against certain persons to protect and defend the interests of the company; that thereafter, on April 13, 1900, a meeting of the trustees of the company was held, and complainant, by F. D. Brown, his attorney in fact, in writing requested the trustees to bring action to recover damages sustained by the company against the defendants and the persons named therein; that at said meeting of the

trustees on April 13, 1900, the demand of the complainant was refused; that on March 17, 1897, F. M. Durfee and F. W. Sherman, jointly and in the name of Durfee and Sherman, were the owners of 265,400⅔ shares of the capital stock of the Sunrise Company; that Durfee and Sherman had then pledged to the Merchants' & Miners' National Bank, of Philipsburg, 127,029⅔ shares as collateral for a debt due by Durfee and Sherman to said bank, and that the remaining 138,371 shares of the said stock were held by J. II. Harper, as assignee of Durfee and Sherman, in trust for the creditors of Durfee and Sherman; that on March 17, 1897, the said bank, J. H. Harper, as assignee of Durfee and Sherman, M. L. McDonald, Robert McArthur, David Sterrett, and Mrs. F. W. Sherman, parties of the first part, made an agreement with Henry Williams, William Thompson, J. L. Hamilton, W. R. Kenyon, J. H. Harper and F. W. Sherman, parties of the second part. The agreement is made part of the master's findings, and is as follows:

"This agreement, made the 17th day of March, 1897, between the Merchants' & Miners' National Bank, of Philipsburg, Montana, Joseph H. Harper, and Joseph H. Harper, assignee of Durfee & Sherman, M. L. MacDonald, Robert McArthur, David Sterrit, and Mrs. F. W. Sherman, of Butte, Montana, the parties of the first part, and Henry Williams, William Thompson, James Hamilton, W. R. Kenyon, Joseph H. Harper, and F. W. Sherman, of Butte, Montana, the parties of the second part, witnesseth:

"That the said parties of the first part, for and in consideration of the various payments to be made as hereinafter specified, as well as of the mutual covenants and conditions herein contained, agree to sell and convey unto the said parties of the second part, their heirs and assigns, three hundred thousand (300,000) shares of the capital stock of the Sunrise Mining & Milling Co., held by the said parties of the first part in the following portions, to wit:

"The said Merchants' & Miners' National Bank holds one hundred and twenty-seven thousand and twenty-nine and ⅔ shares (127,029⅔) as collateral security for indebtedness of said Durfee & Sherman. The said Joseph H. Harper holds twenty-five thousand (25,000) shares in his own right, and one hundred and thirty-eight thousand, three hundred and seventy-one (138,371) shares as assignee of said Durfee & Sherman. M. L. MacDonald holds three thousand (3,000) shares, Robert McArthur, one thousand, five hundred (1,500) shares, David Sterrit, three thousand (3,000) shares, and Mrs. F. W. Sherman, two thousand, one hundred (2,100) shares.

"The said stock is to be deposited in escrow in the Merchants' & Miners' National Bank of Philipsburg, immediately upon the execution of this agreement.

"The said second parties are to work and explore the mines of the said Sunrise Mining & Milling Co., situated at Sunrise, in Granite county, during a period of four (4) months, which said work must be begun on or before the first day of April, 1897, and must be prosecuted with diligence. The said second parties shall employ in said work at least five (5) men continuously, but the said work shall be deemed continuous within the meaning of this agreement if the said second parties shall employ the said five (5) men or more during the twenty-five (25) days of each and every month from the time of their commencing work under this agreement. The said second parties shall, on or before the 11th day of July, 1897, pay, or cause to be paid into the said Merchants' & Miners' National Bank the sum of two thousand and eighty-three and ⁷⁶/₁₀₀ dollars ($2,083.76), which said sum shall be applied in payment of the interest due said bank upon the indebtedenss of said Durfee & Sherman, and on the same day shall pay, or cause to be paid to the said Joseph H. Harper for himself, and as trustee for said M. L. MacDonald, Robert McArthur, David Sterrit, and Mrs. F. W. Sherman, the further sum of three hundred and thirty-four and ⁷³/₁₀₀ dollars ($334.73). The said parties of the second part shall on or before November 11, 1897, pay or cause to be paid into the said Merchants' & Miners' National Bank to the credit of said Joseph H. Harper, assignee of said Durfee & Sherman, the further sum of nineteen thousand, three hundred forty-one and ³¹/₁₀₀ dollars ($19,341.31), and shall also pay or cause to be paid to the said Joseph H. Harper for himself, and as trustee for said M. L. MacDonald, Robert McArthur, David Sterrit and Mrs. F. W. Sher-

man, the further sum of two thousand, seven hundred forty-five and $^{95}/_{100}$ dollars ($2,745.95).

"But if the said parties of the second part shall fail to work the said mines of the said Sunrise Mining & Milling Co., as hereinbefore provided, or shall fail to make any of the payments herein provided for on or before the time when the same shall become due, then the parties of the first part may, at their option, declare this contract void, time being of the essence of this agreement to convey, and shall thereupon be entitled to the immediate possession of the said stock.

"In witness thereof, the said parties of the first part have hereunto set their hands the day and year in this instrument first above written.

"Joseph H. Harper, Assignee,
"Joseph H. Harper,
"Malcolm L. MacDonald,
"Robert McArthur,
"David Sterrit,
"A. A. McDonald, M. & M. Nat. Bank,
"A. A. McDonald, Pres't.,
"Mrs. F. W. Sherman."

The special master found that on March 17, 1897, the company, as party of the first part, made an agreement with Henry Williams, William Thompson, J. L. Hamilton, W. R. Kenyon, J. H. Harper, and F. W. Sherman, parties of the second part, which agreement is as follows:

"This agreement, made the 17th day of March, 1897, between the Sunrise Mining & Milling Company, of Granite County, Montana, the party of the first part, and Henry Williams, William Thompson, James Hamilton, W. R. Kenyon, Joseph H. Harper, and F. W. Sherman, of Silver Bow county, Montana, the parties of the second part, witnesseth:

"That whereas the said Sunrise Mining & Milling Company has incurred an indebtedness in the operation of its mines at Sunrise, Granite county, Montana, and has not been able to hitherto pay the said indebtedness out of any profit received from operating the said mines;

"And whereas, the assignment for the benefit of the creditors by Durfee & Sherman, two of the largest stockholders in the said Sunrise Mining & Milling Company, has crippled the operation of the said mine, and impaired its resources;

"And whereas, Joseph H. Harper, assignee of the said Durfee & Sherman, together with certain other stockholders of the said Sunrise Mining & Milling Company, representing in all three hundred thousand (300,000) shares of the capital stock of the said Sunrise Mining & Milling Company, have deposited in escrow their said stock upon an agreement to sell the same to the parties of the second part above named upon the performance of certain conditions, and the making of certain payments therein specified by the said second parties;

"And whereas it is the desire of the said Sunrise Mining & Milling Company that the said second parties shall explore the said mines belonging to the said first party with the view of discovering and developing, if possible, new ore bodies within the said mines:

"Now, therefore, in consideration of the premises and of the mutual covenants and conditions herein contained, the party of the first part agrees that the parties of the second part may work, explore and develop the mines belonging to the said party of the first part under the supervision, however, of the Superintendent of the party of the first part, for the period of four (4) months from date hereof, it being understood that the parties of the second part will work upon the said mines with a force of not less than five (5) men during not less than twenty-five (25) days of each of said four (4) months.

"And it is further agreed that if the parties of the second part shall purchase the said stock so placed in escrow, as hereinbefore described, then the amount spent by the said second parties in so exploring and developing the said mine, shall become a charge upon the said party of the first part, but if the parties of the second part shall fail to work the said mines in the manner and for the time specified, or if the parties of the second part shall fail to purchase the said stock so placed in escrow. then the said amount expended by them in working and exploring the said mines shall not be a charge upon the

party of the first part, either in whole or in part, and the party of the first part shall be under no obligations whatever to refund or repay to the said second parties any portion of the sum or sums so expended by them.

"If the said parties of the second part shall at any time during the continu-. ance of this agreement fail to perform the work herein specified to be performed by them upon the said mining property, or if the said second parties shall forfeit their rights under the said agreement, then the party of the first part may, at its option, declare this agreement void, and all rights of the second parties hereunder shall thereupon immediately cease, time being of the essence of this agreement.

"The parties of the second part assent to the foregoing terms of this contract. They agree to do all work which they may do hereunder upon said mines in a good and minerlike manner, and at the termination of this contract to immediately surrender possession of said property to the party of the first part. They further agree that all work done hereunder shall be done under the supervision and in accordance with the wishes of the party of the first part.

"In witness whereof, the parties of the second part have hereunto set their hands, and the party of the first part has caused this instrument to be executed by its board of trustees, and its corporate seal to be affixed, the day and year in this instrument first above written.

"Sunrise M. & M. Co.,
"Joseph H. Harper, Trustee,
"F. W. Sherman, Trustee,
"Malcolm L. MacDonald,
"David Sterrit.
"A. A. McDonald,
"D. M. Durfee.
"F. M. Durfee,
"Joseph H. Harper,
"F. W. Sherman,
"W. R. Kenyon,
"H. Williams,
"William Thompson,
"J. L. Hamilton."

The master further found that on March 17, 1897, Henry Williams, William Thompson. J. L. Hamilton, W. R. Kenyon and Joseph H. Harper, parties of the first part, made an agreement with F. W. Sherman, party of the second part, which agreement is as follows:

"This agreement, made the 17th day of March, 1897, between Henry Williams, William Thompson. James Hamilton, W. R. Kenyon and Joseph H. Harper, all of Butte City, Montana, parties of the first part, and F. W. Sherman of Sunrise, Montana, party of the second part:

"Now, whereas, certain stockholders of the Sunrise Mining & Milling Company, including principally, The Merchants' & Miners' National Bank and Joseph H. Harper, assignee of Durfee and Sherman, have this day entered into an escrow agreement, to sell to the parties of this agreement, 300,000 shares of the capital stock of the Sunrise Mining & Milling Company on the following terms, viz.: That the parties of this agreement shall, first, work and explore the mines of the said company, during a period of four months, which work must be begun on or before the 1st day of April, 1897, and must be prosecuted with diligence, constantly employing five men.

"Second, That they shall pay or cause to be paid, on or before the 11th day of July, 1897, to the Merchants' & Miners' National Bank the sum of two thousand, eighty-three and $76/100$ dollars ($2,083.76), and to Joseph H. Harper for himself and as trustee for M. L. McDonald, Robert McArthur, David Sterritt and Mrs. F. W. Sherman. the further sum of three hundred. thirty-four and $73/100$.

"Third. That they shall pay or cause to be paid, on or before the 11th day of November, 1897, into the Merchants' & Miners' National Bank, of Philipsburg, to be placed to the credit of Joseph H. Harper, assignee of Durfee & Sherman. the sum of nineteen thousand, three. hundred, forty-one and $31/100$ dollars ($19,341.31) and to Joseph H. Harper for himself and as, trustee for the par-

ties heretofore named, the sum of two thousand, seven hundred, forty-five and ⁹⁵/₁₀₀ dollars ($2,745.95).

"And whereas, certain other stockholders of said company, including C. H. Eshbaugh, Thomas Botscheider and many others, have deposited their holding of stock in escrow, with the Merchants' & Miners' National Bank, to be sold to the parties of this agreement, upon the payment, by these parties, of the sum of ten cents per share on or before the 10th day of November, 1897.

"Now, therefore, it is agreed by the parties of the first part, that they will each pay to F. W. Sherman, the party of the second part, the sum of $100.00 per month for a period of four months, commencing March 22nd, 1897, and ending July 22nd, 1897, the money so paid, to be expended by the party of the first part, upon development work, in the mines of the Sunrise Mining & Milling Company, as hereinafter agreed by the party of the second part.

"Also it is agreed by the parties of the first part, that they will each, on or before the 11th day of July, 1897, pay their proportionate amount of the $2,083.76, to the Merchants' & Miners' National Bank and of the $334.73 to Joseph H. Harper and Joseph H. Harper trustee, heretofore mentioned, which proportionate amount is Four hundred, eighty-three and ⁷⁰/₁₀₀ dollars ($483.-70), provided that the development work performed upon the Mines of the Sunrise Company, by the party of the second part, has opened up sufficient ore, to justify in their minds, the making of said payment.

"It is further agreed, by the parties of the first part (provided the work done and performed upon the mines of said company, between the date of this instrument and November 11th, 1897, shall prove to each of them, that the purchase of 300,000 shares of said company stock, is a good investment) that they will each make a final payment, of three thousand, nine hundred, sixty-eight and ⁴⁵/₁₀₀ dollars ($3,968.45), to complete the purchase of the said 300,000 shares of stock, placed in escrow, as hereinbefore mentioned.

"The party of the second part, in consideration for the $500.00 per month paid to him by the parties of the first part, agrees to employ four good miners, furnishing all supplies for the same, and in company with said miners, will work continually upon the mines of the Sunrise Company from March 22nd, 1897, to July 22nd, 1897, unless by mutual consent, of the parties of this agreement, this development work should cease at an earlier date, in that event the party of the second part, shall only receive pay for actual time worked.

"The party of the second part further agrees, in event of a final payment by the parties of the first part to also pay as his share of that final payment, the sum of two thousand, two hundred, forty-five and ¹/₁₀₀ dollars ($2,245.01).

"It is mutually agreed, by the parties of the first and second part, that should the final payments be made, as hereinabove stated, that the members of this agreement shall each receive 50,000 shares, from the 300,000 share escrow agreement.

"It is further mutually agreed, that each member of this agreement shall have the privilege of purchasing one sixth, of the stock placed in escrow by C. H. Eshbaugh et al., upon the payment of ten cents per share.

"In witness whereof, the parties of the first and second part have hereunto set their hands, the day and year in this instrument first above written. Agreement in triplicate.

Joseph H. Harper,
"W. R. Kenyon,
"H. Williams,
"William Thompson,
"J. L. Hamilton,
"F. W. Sherman."

Indorsed: "Agreement between Henry Williams et al. and F. W. Sherman."

The master found further that on March 17, 1897, A. A. McDonald was president of the Merchants' & Miners' National Bank, of Philipsburg; that upon the same date J. H. Harper was personally the owner of 2,500 shares of the capital stock of the company; that upon the same date, M. L. McDonald owned 3,000 shares of the capital stock of the company; that upon March 12, 1897, and at the time of making the agreements mentioned, and from that date until the month of September, 1897, F. W. Sherman was the superintendent and general manager of the Sunrise Company, and discharged the duties of his position in and about the business and property of the company; that no meeting

of the stockholders of the company was held prior to the making of the agreements specified, and that no proceedings were taken by any stockholder or party interested in the company to modify or annul the agreements; that William Thompson, J. H. Harper, Henry Williams, J. L. Hamilton, W. R. Kenyon, and F. W. Sherman, after March 17, 1897, under the agreements mentioned, enjoyed the possession for a period of four months of some of the properties belonging to the company, and caused work to be done in exploring and developing some of its mining properties, and paid for the labor and material furnished for those purposes, and all indebtedness incurred under said agreements; that William Thompson, J. H. Harper, Henry Williams, J. L. Hamilton, W. R. Kenyon, and F. W. Sherman did not pay for any shares of the capital stock of the Sunrise Company described in the agreements mentioned, and never claimed any rights thereunder after July, 1897; that Helen C. Harper brought an action in the state courts and recovered judgments against the company upon December 6, 1897, for the sum of $3,097.30, and interest; that subsequent to the entry of judgment in favor of Helen C. Harper judgments were made and entered in the state court against the company in actions commenced by several persons, whose claims aggregated $5,590.47: that the judgments just referred to were founded upon accounts for goods furnished or for services rendered to the Sunrise Company, and that the judgments were obtained without the request or solicitation of William Thompson, A. A. McDonald, D. M. Durfee, J. H. Harper, Henry Williams, T. M. Durfee, J. L. Hamilton, W. R. Kenyon, and David Sterrett, or any of them; that fifty laborers' and wage-earners' claims and liens were filed amounting to the sum of $4,866.42, and that the liens were satisfied by the sheriff; that F. W. Sherman, acting in his own behalf, aided and advised the laborers and wage-earners in preparing and causing to be filed and served upon the sheriff the said liens; that upon June 28, 1898, Helen C. Harper caused to be issued out of the court an execution on her judgment, and levied upon the property of the company; that thereafter notices of sale were published, and that the sheriff sold the property at public sale; that William Thompson made the highest and best bid, to wit, $12,000, and received a sheriff's certificate, and that Thompson bought the property as trustee for certain judgment creditors of the company, to wit, Helen C. Harper, Baker & Harper, May Sterrett, as administrator of the estate of David Sterrett, deceased, the Montana Hardware Company, and Marie Wood. That the right of redemption from said sale was not exercised by the company, or its successors; and that on the 2d day of July, 1898, and until the commencement of this suit, the Sunrise Company was insolvent, and without funds to bring any action regarding the matters set forth in the complaint.

As conclusions of law, the master found that the judgments obtained against the Sunrise Company were valid; that the claims of the laborers against the company were valid; that the contracts mentioned were void as against the Sunrise Company and all stockholders not parties thereto; that the sale of the property of the Sunrise Company upon July 2, 1898, to William Thompson, and the proceedings of the sheriff of the county of Granite on said judgment for said Helen C. Harper were lawful; that William Thompson acquired legal title to the property; that the complainant, and parties in whose behalf the action was commenced by complainant, are not entitled to recover damages against the defendants, or any of them. The master recommended the dismissal of the complainant's bill.

On April 3, 1903, counsel for the complainant, without waiving complainant's right to except to the findings of fact and conclusions of law contained in the special master's report, objected to the report, and prayed the court to refer the report of the special master back to him, because the master failed to find upon many questions of fact which complainant's counsel alleged were material, and upon which findings had been requested. The objections and prayer were denied. Thereafter, on May 31, 1904, complainant filed his exceptions to the report filed by the special master.

The case has been submitted upon the exceptions and upon the merits.

Bach & Wight, for plaintiff.

E. N. Harwood and E. B. Howell, for defendants.

HUNT, District Judge (after stating the facts). The records of the case show that in September, 1901, defendants asked the court for a trial by jury, and the request was denied. This request was not made, however, until after the cause had been referred to a special master, and until after he had filed his report. As the learned judge who then presided over the court did not record his reasons for denying a jury trial to the defendants, his exact views cannot be stated. It is probable that he was of the opinion that the suit was one wherein equity might afford relief if upon the whole record complainant showed himself entitled thereto. However that may be, it is safe to say that so far as defendants are concerned their request for a jury was predicated upon the ground that complainant had a remedy adequate at law; hence that his suit in equity could not be maintained. This question of relief and jurisdiction in the case has forced itself upon my attention as I have progressed in the consideration of the record, and the oftener I have analyzed the kind of relief sought, together with the purposes of the bill, the stronger has become the conviction that the action is to recover a mere judgment for damages upon a past transaction. If the cause of action is of a legal nature, and complainant has a full and ample remedy at law for the wrongs complained of, equity has no jurisdiction. This is elementary. Nor will a mere charge of fraud give equity jurisdiction; nor will averments in regard to conspiracy and violation of trust authorize a court of equity to exercise jurisdiction, if the action is really one arising in tort, for which defendants are liable in damages, where the damages can be just as readily ascertained in an action at law as in equity.

To state the doctrine in the language of the Supreme Court in Hipp v. Babbin, 19 How. 271, 15 L. Ed. 633:

"Whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury."

And as that same court said in Buzard v. Houston, 119 U. S. 352, 7 Sup. Ct. 252, 30 L. Ed. 451:

"In cases of fraud or mistake, as under any other head of chancery jurisdiction, a court of the United States will not sustain a bill in equity to obtain only a decree for the payment of money by way of damages, when the like amount can be recovered at law in an action sounding in tort, or for money had and received."

The bill of this complainant states a case for damages maintainable at law. If the judgments entered against the company under which the property of the corporation was sold were procured to be entered by wrongdoing of the defendants, such judgments would be no more binding upon plaintiff at law than in equity; or if the defendants are guilty of the wrongs alleged, and are guilty of a trespass upon the property of the corporation, an action at law is the proper remedy to hold them liable, as plaintiff asks that they should be held, "at least to the extent of the judgments which were wrongfully entered against the company."

That complainant regards his action as one for damages is again made plain by his brief on motion to dismiss as to O. J. McConnell, ad-

ministrator, wherein his counsel characterize the suit as one "to recover, in behalf of the Sunrise Mining Company, or such of its stockholders as should join plaintiff in the prosecution of this suit, damages, or compensation for any injury perpetrated by the defendants in the guise of what is known as the Butte Syndicate." Complainant's counsel proceed upon the theory that the suit is equitable; yet, in arguing the question of the survival of the cause of action, which arises in the case, they ask the court to consider the nature and substance of the cause of action, and not the form in which it is presented, and then proceed to speak of it as an action to recover from the defendants the amount of an "unlawful indebtedness which they had fraudulently imposed" upon the property of the Sunrise Mining Company.

Counsel further define their own view by the following language from one of their briefs:

"It seems perfectly clear that the cause of action originally arose out of the contract between the syndicate and the corporation, whereby the syndicate acquired possession of the property. Of course, this contract was void and illegal as to the minority stockholders, and the master so declared it to be. But simply because a contract is void presents no reason why the party who receives any benefit from it should not respond to the other party for such benefit, or, if one party to such contract succeeds in injuring another party, no reason is presented why such other party might not recover from the one causing the injury compensation therefor. So that, if we consider the action as one brought to compel the Butte Syndicate to account to the complainant or the corporation for damages arising out of acts committed under a contract, which has been declared void, the nature and substance of the cause of action is based upon a contract and comes clearly within the provision of section 2731. But again, by the action of the Butte Syndicate, through the conspiracy above noted, complainant's stock in the Sunrise Mining Company became valueless, and was destroyed. Therefore complainant and other stockholders in like situation might maintain this suit against the personal representatives of any members of the syndicate who have died, under section 2733, on the ground that their intestates in their lifetime wasted or destroyed the goods or chattels of the complainant and other minority stockholders. But again, the action survives against the personal representatives of those members of the syndicate who have died, upon the theory of a trespass upon the real estate of the corporation. Considering this suit as an action in behalf of the corporation for the purpose of recovering against the members of the Butte Syndicate the damages to the corporation, which resulted from a trespass upon its property by the members of the Butte Syndicate, we submit that such syndicate took possession of the property under a contract which was unlawful and void. Therefore such possession was unlawful, and any damage which resulted to the company because of such possession or because of any act committed by the Butte Syndicate to the injury of the property during such possession is a damage arising or resulting from a trespass to the land of the corporation, and survives under the provisions of section 2733, Montana Code."

But regarding it as a suit for damages, as we have seen, equity will not afford the relief asked; nor will equity afford relief upon the ground that it is an action to recover for waste; nor will equity afford relief upon the last theory advanced by complainant that it is an action in trespass upon the real estate of the corporation. United States v. Bitter Root Company, 200 U. S. 472, 26 Sup. Ct. 318, 50 L. Ed. 550.

A judgment for pecuniary damages being the redress complainant is seeking, such a judgment would adjust and settle all rights; but a bill for such relief cannot be maintained on the equitable side of

the court. Jones v. Mutual Fidelity Company (C. C.) 123 Fed. 506. No discovery, as discovery proper, is sought, as answer under oath is expressly waived; so the bill is not for discovery. Security Savings & Loan Ass'n v. Buchanan, 66 Fed. 799, 14 C. C. A. 97; McFarland v. Bank (C. C.) 132 Fed. 399. No accounting is sought, and clearly there could not be any intricacies which would make an accounting necessary. Had complainant sued at law, he might have procured an order for the inspection of any books or records of the defendant company, or its officers, and secured whatever information therefrom he could in equity. United States v. Bitter Root Company, 200 U. S. 473, 26 Sup. Ct. 318, 50 L. Ed. 550. Nor is injunction sought; nor is the court asked to cancel any instruments, or to declare void the judgments under which the sale of the property was had.

To conclude upon this question: Were it not for the ruling of Judge Knowles denying the defendants' motion for a jury trial, I would dismiss the bill solely upon the ground that no case is presented for relief in equity. But proceeding with the case upon the report of the master, and regarding it as one where equitable relief could be granted upon the pleadings, I am still of the opinion that complainant cannot prevail.

To state the testimony in detail would be but to extend this memorandum opinion to unnecessary length, for I should have to incorporate considerable of it as given, on direct and cross examination, and quote it as exactly given by witnesses on both sides. It is enough to say that I have given it my careful and repeated reading. Moreover, I have considered the evidence given by the defendants who were both directors and members of the syndicate as subject to the need of very close scrutiny, for I believe that the position of all such persons is one generally to be looked upon with disfavor by the law, and that the burden is upon all who hold such relationships to show implicit integrity and good faith. There are some circumstances besides the relationship of Harper and Sherman to the corporation and to the syndicate, notably the letter of Harper to Sherman, dated June 16, 1897, to the effect that it would be policy to keep anything in the way of a strike as quiet as possible lest McLure's animosity be awakened, which tend to show a desire on Harper's and Sherman's part to withhold full information from McLure, a stockholder. But scrutinizing the whole transaction from beginning to end, the evidence fails to show a conspiracy or fraud in fact on the part of the defendants.

It satisfactorily appears that Sherman became the superintendent of the Sunrise Company sometime in 1894, and that thereafter he and McLure, a stockholder in the Sunrise Company, and evidently active in connection with the affairs of the company, became involved in a controversy over a block of the stock of the corporation. The significance of this matter is that it sheds light upon the personal relations existing between Sherman and McLure. There was litigation over various matters connected with the shares referred to between McLure and Sherman, and evidently bad blood existed between them. Sherman became a partner with Frank M. Durfee, and the two of them owned a controlling interest in the Sunrise property. Besides other holdings, the firm of Durfee and Sherman in 1895 bought 127,000

shares, to pay for which they borrowed money from the Merchants' & Miners' National Bank, of Philipsburg, and hypothecated the stock as security. In May, 1896, Durfee and Sherman made an assignment for the benefit of their creditors to Joseph H. Harper, a defendant in the action. Harper was also an individual stockholder in the company, owning 25,000 shares. The Sunrise Company owed about $2,000 at that time, but was not making any considerable money. They closed down about October, 1896, owing about $5,000. Among the debts of the company when it shut down were certain labor claims, and these claims were bought by Helen C. Harper, who was the wife of the defendant, the said Joseph H. Harper. There were other creditors of the company, but they did not then enforce their claims. Mrs. Harper purchased labor claims to an amount of $2,792.36, the purchase having been advised by Mr. Howell, counsel for Mr. Harper, assignee of Durfee and Sherman, with a view to protect the stock under assignment by Durfee and Sherman. Harper, as assignee, in good faith tried to sell the Durfee and Sherman stock, so as to pay the Durfee and Sherman debt to the bank; but the appearance of the mine was such that no purchasers were found.

In January, 1897, a stockholders' meeting of the company was held, and the situation that confronted the corporation was an unhappy one. The mine had been shut down in October, 1896, for lack of ore. The company owed over $5,000, $2,700 of which was for labor claims that had been bought by Mrs. Harper. The majority of the stock was held by defendant Harper, as assignee for Durfee and Sherman, and he had not been able to sell the stock. At this meeting Sherman, who believed in the mines, suggested a plan of getting up a syndicate of men in Butte who would expend money in doing development work on the property, and who might take an option on the Durfee and Sherman stock. Sherman proceeded to carry out his plan, and enlisted Williams, Hamilton, Kenyon, Thompson, and Harper, who have been referred to, in the matter. The several contracts set forth in the statement were made. By one of them the syndicate of Butte persons took an option upon the Durfee and Sherman stock at a price which would liquidate the indebtedness of Durfee and Sherman, if the option was availed of. This option was a private arrangement between the parties to the agreement. But of the individuals who entered into this option, A. A. McDonald, as president of the Merchants' & Miners' Bank, J. H. Harper, M. L. McDonald, and F. W. Sherman, were also trustees of the corporation, and Harper was also assignee of the firm of Durfee and Sherman, and was also an individual stockholder in the company.

By the agreement between the corporation and the individuals the privilege of doing certain development work upon the mines of the company was granted. The purpose of this latter agreement was to explore, hoping to open further bodies of ore, and prove the mines of real value. The work to be done by the syndicate was to be done under the supervision of the superintendent of the Sunrise Company, and the money expended by the syndicate was not to become a charge upon the company, unless the members of the syndicate who were interested in the option held upon the Durfee and Sherman stock

should subsequently purchase the stock under the option. Evidently the directors thought that if, in exploration, the syndicate should open bodies of ore of commercial value, the corporation would be so benefited by the exploration that it could afford to pay the costs of the development work done by the syndicate.

The third agreement was that wherein Sherman agreed to do the work of exploring for the syndicate. Now, when these three agreements were made, Sherman was still exercising authority as superintendent of the corporation, with the knowledge and approval of the board of directors. It is true that when the mill was closed down, there was but little for him to do; yet there never was a revocation of his authority as superintendent, and it certainly appears that he was the person who was regarded by the trustees of the corporation as the superintendent and the one designated, within the meaning of the contract, to supervise the exploitation. As I have indicated, these contracts and agreements are properly the subject of very close scrutiny. Sherman and Harper particularly put themselves in dual relationships, which demand of them satisfactory explanation, in order that they may be acquitted of any wrongdoing. On the other hand, the court must consider all the circumstances of the case. And it is in regarding the whole history of the transaction that I cannot find sufficient evidence of conspiracy. Sherman evidently had confidence in the mine. His letters indicate this all through, and if the exploration work had disclosed bodies of valuable ore, it would have been a very good thing for the company, and the stockholders would have greatly benefited. Sherman's attitude was one well calculated to put him in a position where his acts might be questioned by either side, for he certainly exercised authority as superintendent of the company, as well as agent of the Butte Syndicate, and he had large personal interest as a stockholder. He went ahead to explore and develop the mines for the syndicate, but at the same time acting under the belief that it was within the scope of his authority, as superintendent of the company, he expended certain money in behalf of the corporation in putting the mill and roads in proper condition to operate the mine.

About August 10, 1897, the mill was started, being fed by ore which was disclosed by the development work paid for by the Butte Syndicate. The directors of the corporation say that it was understood that the mill was to be started, and that Sherman was to look after the work. But after 10 days of operation a loss was shown, and the ore in the mine appeared to be growing less valuable. So the whole thing was again shut down, and again the situation was bad. Sherman went to Butte. There was no money in the treasury, and Sherman notified the creditors that they need not defer action any longer.

Helen C. Harper then brought an attachment suit upon the labor claims which she had purchased the year before. Four other creditors —the Montana Harware Company, a creditor to the extent of $799.63, Baker & Harper, creditors to the extent of $560.75, May Sterrett, for $223.50, and Marie Wood, for $666—brought actions, and attached the property of the company on August 19, 1897. Laborers

151 F.—51

also filed liens amounting to about $4,866 for labor done for the company in July and August, 1897. The receiver of the Merchants' & Miners' National Bank intervened in these suits, and alleged that all of the causes of action were fraudulent and collusive. About that time Mr. Frank A. Smith interested himself in the matter and sought an option from Mr. Harper and other owners of Sunrise stock upon an arrangement generally similar to that which had been given to the Butte Syndicate. The assignee of Durfee and Sherman said that the attachment suits pending should be disposed of, and the charges of fraud determined before any option could be given. Thereupon Smith so arranged matters that the receiver and the Sunrise Company withdrew their appearances in the suits, and permitted the attaching creditors to take judgments for their respective claims, and, in turn, the attaching creditors agreed to give the corporation a six-months' stay of execution. As the law gave to the company the right to redeem within a year, the effect of the extension of six months was to give the corporation 18 months wherein it might secure funds to redeem and prevent the loss of its property. The adjustment of these suits was made after full knowledge of the whole situation on the part of the directors of the company, and the receiver of the bank, and their attorneys.

A meeting of the directors of the corporation was held in November, 1897, at Drummond. Necessary resolutions were passed by the board approving of the arrangements referred to, stipulations were signed, the answers of the Sunrise Company were withdrawn, judgments were taken without opposition by the attaching plaintiffs, and a stay of execution for six months given. The directors then passed a resolution recognizing the validity of the labor claims against the Sunrise Company. The object of this was to enable the claimants to sell their claims more easily. Smith, heretofore referred to, after the settlement of the suits, made a contract with the company, by which he was to make certain ore tests, but he never carried out his contract.

There was a stockholders' meeting in January, 1898, at which F. D. Brown, who was the agent of McLure, just heretofore referred to, was elected a director. E. I. Holland, Vincent Smith, a son of F. A. Smith referred to, F. M. Durfee, D. M. Durfee, A. A. McDonald and J. H. Harper were elected directors. Complainant had notice of this meeting, but did not attend. It satisfactorily appears that Mr. McLure's friends on the board and Mr. Sherman's were equal in number, which gave to Mr. Smith, who held a neutral attitude, apparently, the balance of power. Nothing was done during the stay of execution which had been granted, and at the end of that period execution was issued in favor of the judgment creditor Mrs. Harper, holding a judgment conceded to be valid, and on July 2, 1898, the property was sold at public auction, and bid in by William Thompson, who had been a party to one of the contracts already referred to, Thompson representing the judgment creditors Helen C. Harper, Baker & Harper, May Sterrett, administratrix, Montana Hardware Company, and Marie Wood. Thompson's bid was about $12,000. It appears that on the day of the sale, and subsequent thereto, Thompson conferred with F. M. Durfee, the president of the corporation, and also with one of the

directors, urging them to hold a meeting with a view of negotiating a loan upon the properties of the corporation, to the end that there might be a redemption from the execution sale which had just theretofore taken place. His attitude appears to have been entirely frank and fair. Nothing, however, was done by the directors. Thereafter, in the fall of 1898, Harper, as assignee of Durfee and Sherman, sold the Durfee-Sherman holdings at public auction. The stock was bought by A. A. McDonald for the Merchants' & Miners' National Bank, and afterwards turned over to the Thompson Investment Company. There was litigation in the state courts growing out of this sale, but the Thompson Investment Company prevailed in this litigation by decisions of the Supreme Court of the state, reported Durfee v. Harper, 22 Mont. 354, 56 Pac. 582, Id., 22 Mont. 373, 56 Pac. 589. In June, 1899, James A. Murray, representing C. D. McLure, purchased the certificate of sale which William Thompson had secured the preceding year upon the properties of the Sunrise Company, together with all the holdings of the Thompson Investment Company, amounting to something over 304,000 shares, and a sheriff's deed upon the certificate of sale was issued to an attorney in the employ of Mr. McLure. On June 28, 1899, after McLure had completed the purchase of the stock from Thompson, and while he was possessed of the sheriff's certificate of sale, a meeting of the board of directors was called. This meeting was attended by Vincent Smith, who was a son of F. A. Smith heretofore referred to, E. I. Holland, an employé of a mining company at Philipsburg, in which Mr. McLure was largely interested, F. D. Brown, an agent and attorney in fact for Mr. McLure, and F. M. Durfee, whose sympathies were against Harper and Sherman. The minutes of this meeting of the directors show that a committee was appointed with authority to borrow for the company the sum of $30,000, for one year, for the purpose of redeeming the property, paying off the judgments and liens, discharging liabilities, costs, expenses, and whatever balance there might be was to be held for the purpose of resuming the conduct of the business of the corporation. Some efforts to obtain a loan of $30,000 were made, but they were by no means diligent, and it would look as if the directors had but little confidence in the value of the mines, or were indifferent in the matter, or as if those to whom they applied for a loan had no great faith in their value. The company did not need a loan of $30,000 at that time. Had application been made for a loan in a sum merely sufficient to redeem, not more than $20,000 would have been required.

The defendants sought, throughout their testimony, to show that Mr. McLure was really the party behind the plaintiff in this action, and that it was not brought in good faith by the plaintiff, but as a part of a plan to thwart the defendants in every way that he could. And there is evidence tending to show that Mr. McLure, through his business associates, did instigate the plaintiff to begin this suit, and that it is a culmination of the frequent wrangles among the directors and managers of the Sunrise Company. Still, I do not attach importance to this, because complainant undoubtedly had a legal right to sue; but it does have some bearing in weighing the testimony of the plaintiff

himself, and in sifting the whole evidence, with a view of arriving at the merits of the controversy from an equitable standpoint.

I am considering the case, too, always mindful of the allegations of fraud and conspiracy, and, as before indicated, I think the position taken by Sherman and Harper, who acted as trustees of the company, and for their own personal interests as well, was one that ought not to have been assumed, and which a stockholder might justly have complained of at a proper time by appropriate proceedings; still, considering all the circumstances known to all the directors, the contracts were really efforts by way of a desperate chance to prove the property valuable, and I do not believe that the purpose of the parties was to cheat or defraud anyone, or that the debts contracted in the name of the company were fraudulent. The sum actually expended by the syndicate for exploration work never became a charge against the corporation, and no purchase of the stock that was in escrow was had by the syndicate.

Complainant earnestly contends, however, that because Sherman, acting as manager or superintendent of the corporation, incurred certain expenditures in behalf of the company at the time he was also doing the development work for the syndicate, his acts, in so doing, were a fraud upon the company, and the judgments of certain creditors were fraudulent. I do not think so, considering all the evidence in the case. There was no good faith lacking, and, as far as the evidence shows, Sherman believed that under the agreement the syndicate was to do the exploration work, but that the company was to put the mill in condition to work any ores which might be taken out by the syndicate. It was under this belief that Sherman commenced to repair roads and tramways, and to build ore chutes for the corporation. This understanding of the contract itself was not erroneous, for the syndicate could not take the ore mined.

Stress is laid, too, upon that feature of the contract which put upon the corporation the costs of the work performed by the syndicate, if ore should be found. While this may have been an unnecessarily severe expense to contemplate putting upon the corporation, it does not justify an inference of fraud on the part of the contracting parties; for, if valuable ore had been discovered, the company could have afforded to stand the outlay that had been made, and looked upon the venture as very profitable, and made without real risk to itself. But the hopes of the directors and others were not well founded. No good ore was found. The company could not pay its debts. No one appears to have been willing to loan it money to save itself, and, although advertised to be sold at public auction to satisfy a judgment, no one had enough confidence in the mines to give more than $12,000 for the whole property. I think it but fair to say that in the light of the several failures to discover ore of sufficient value to justify operation and of the failure to realize larger prices upon the Durfee and Sherman holdings very few had any substantial faith in the property.

Complainant, in his bill, expressly avers that the judgments obtained by Helen C. Harper, Baker & Harper, Marie Wood, Sanders & Sanders, and May Sterrett, amounting to the sum of $6,888.63, were valid against the Sunrise Company at the time of the sale of the property

under the execution. But his contention is that by means of the other judgments and liens,, which it is alleged that defendants procured to be filed against the company with a view to defrauding it, the amount necessary to redeem the property from the sale under the execution was increased in a sum so large that the company could not borrow the money wherewith to redeem its property. But even assuming that the judgments other than those conceded to be valid ought never to have been taken against the corporation, it is indisputable that the persons in whose favor the judgments had been rendered, and who had performed the services or furnished the materials, did so upon the strength of the representations made in good faith by Sherman, assuming to act for the corporation, and held out by the directors as superintendent. No argument can be successfully made that in the services themselves, or in the value of the material furnished, there was anything wrong as between the creditors and the corporation; hence the corporation was not in a position to dispute these claims.

The sale, which was alone under execution issued by Mrs. Harper, in her judgment against the corporation, was perfectly valid. At that time, too—about June 28, 1899—the directory was not in the control of persons alleged to be involved in wrongs against this complainant. Vincent Smith, E. I. Holland, F. D. Brown, and F. M. Durfee were four directors, only one of whom—F. M. Durfee—is a defendant here. Clearly, Thompson, the purchaser at the execution sale, was anxious that the property should be redeemed, for he took immediate steps to confer with the president and other officers of the corporation upon the subject. There was ample time for the directors or stockholders to have instituted proper proceedings to prevent the sale or transfer of the property, or to have annulled any judgments which might have been obtained by fraud; but no seasonable action of any kind was taken.

The case, therefore, must stand without satisfactory proof of fraud in fact or of conspiracy by the defendants to wrong the Sunrise Company or its stockholders, and with the elimination of fraud in fact. what is left for a court of equity to consider? Even granting the directors exceeded their legal powers in making the contract with the syndicate, yet equity will not grant a mere money judgment to stockholders against directors to recover damages for moneys, for the payment of which their corporation is liable, and where a sale under a valid judgment has been had, and where no actual fraud underlies the transaction. The case is very unusual in its facts, and while the courts should never depart from the principle that directors, as agents, are forbidden to exercise their powers for their own personal ends against the interests of their companies, yet the features and facts disclosed herein relieve the transaction complained of of a, fraudulent character.

The petition to send the case back to the master was denied once by Judge Knowles, and I shall abide by his ruling. There is evidence to support each of the master's findings of fact. The exceptions to the master's findings of fact are overruled. In his conclusions of law, the master found that the contracts for the purchase of the stock, and between the directors of the corporation and the Butte Syndicate, were

void as against the corporation and all stockholders not parties thereto, and by another finding the master concluded that the complainant, and parties in whose behalf he sued, are not entitled to recover damages against the defendants or any of them.

Under my view of the case, conclusion No. 6, that complainant cannot recover damages in this action is accurate. Whether the several contracts were void as against the Sunrise Company and the stockholders thereof, or were simply voidable, becomes immaterial. I am satisfied, however, no one of them was void. Mutual Benefit Life Insurance Co. v. Winne, 20 Mont. 20, 49 Pac. 446. The contract between the corporation and the members of the Butte Syndicate, and that between the members of the syndicate and Sherman were, at most, voidable; but the individual contract for the option was always valid as against complainant. But the complainant is not seeking to have any contracts declared void, and no steps ever have been taken with such end in view. Conclusion No. 3 of the master is therefore, immaterial to the present case, and will be disregarded.

Finally, believing that the judgments were valid, and that the complainant has not established that defendants conspired to wrong or defraud the corporation or its stockholders, it follows that the findings and conclusions of the master, as modified by striking out conclusion No. 3, should be adopted, and the bill dismissed.

So ordered.